PEARCE v. QUINCY MINING CO.[1]

1. Jury—Competency—Person Employed by Party.
   A person in the employ of one of the parties is incompetent to sit as a juror.

2. Same—Harmless Error.
   Where there is no claim that an impartial jury was not secured, a judgment will not be reversed because the court overruled a challenge to an incompetent juror, though the party objecting challenged him peremptorily, and used all his peremptory challenges.

3. Master and Servant—Death of Servant—Action — Istruc-
   tions—Sufficiency.
   In an action against a mine owner for the death of a minor servant caused by a fall of rock in the mine, instructions as to negligence, contributory negligence, duty to warn, and deceased's knowledge of the danger, examined, and held, correct and applicable to the case.

Error to Houghton; Streeter, J. Submitted June 11, 1907. (Docket No. 63.) Decided July 1, 1907.

Case by James H. Pearce, administrator of the estate of Timothy Sullivan, deceased, against the Quincy Min-

---

[1] Rehearing denied October 4, 1907.

ing Company for the negligent killing of plaintiff's intestate. There was judgment for defendant, and plaintiff brings error. Affirmed.

This is an action of tort, based upon the alleged negligent killing of plaintiff's intestate, Timothy Sullivan. Timothy, at the time of his death, was a little over 16 years and 2 months old. The declaration alleges that he "was an intelligent, ambitious, strong, and healthy boy, and accustomed to earn large wages." He was killed by a fall of rock from a hanging wall. The claim of negligence in the declaration is that, without warning, instruction, or explanation, the deceased was sent to work in a place where there was latent or extraordinary danger; that "the place was attended by latent or extraordinary danger, as hereinbefore stated, in that blasting had been, and was being, done in said stope or place, and the hanging wall of said stope or place might be or become loose, and rock or earth might become detached from said hanging wall and fall upon persons working there and injure them." The deceased entered the employ of the company September 7, 1904, and was killed December 6, 1904. He had previously worked one month in another mine. He was what was called a "pony boy," i. e., his first employment was mainly to run a pony engine. The evidence establishes the fact that these boys are also employed at other work. They run errands, help to clean out the stopes, and do other work. That is the manner in which boys learn to become miners. His own brother, a miner, working in the same mine, testified:

"I know when the pony stopped running that Tim was doing something else."

The testimony of other miners is:

"There is no boy hired for any one purpose. He runs a pony when it is needed; otherwise he works around the mine, * * * cleaning the levels, oiling the tram cars, running dirt for the trammers, carrying drills and water for the miners, filling miners' places. His duties as a

pony boy bring him into acquaintance with all parts of the mine. He does little jobs that he is able to do around the mine, cleaning up levels, running dirt in stopes, work in a miner's place.  *  *  *  It is the custom in mining districts that, after two or three months' experience operating a pony, to work at the foot of stopes."

The deceased and a miner named William Halgreen were employed shoveling dirt or rock from the south part of the stope and wheeling it to a hole and dumping it into the stope below. How the work was done, and how the deceased met his death, appears from the testimony of the miner Halgreen as follows:

"I am 32. I have worked for the Quincy about five or six years altogether at all kinds of work. I couldn't name them all. I have trammed. I have worked as a miner, stemming. I have worked as a timberman. I have worked for the Quincy five or six years, seven different times. I now live in Minnesota. I went there about a month ago. My folks live there. I am farming. I own a farm. I was working in the Quincy on December 6th of last year in the ninth level. I worked with Timothy Sullivan. We shoveled dirt in the wheelbarrow and wheeled the wheelbarrow to the hole. That was on the night the accident happened. There were two company men and the boy and I and four miners working on that night shift in that level. I was working on the south side of the hole. The dirt was about 18 or 20 feet from the hole. The nearest stull timber was about 10 or 15 feet from the hole. I am not sure. There was a broken stull timber in the level that was laying down on the level, the hanging side of the level, about six or eight feet from the hole, south of the hole. I don't know how many shifts Sullivan and I worked there altogether, two or three. I knew Sullivan. I saw him first when he started to work with me. I had a talk with him as to what part of the work he would do. I told him that he had to shovel the dirt into the wheelbarrow, and I would put it into the hole. He didn't do any wheeling. That was too heavy for him. I went to work about half past 6. I noticed two pieces of rock that came down from the hanging that night. The first piece came down about, I couldn't tell sure, about 10 o'clock. It wasn't very large. It was small. I am not sure where the piece came from, but I think it came from

the hanging; somewhere on the back. It fell so that part of it went into the hole and another fell down close to where Timothy Sullivan was; some of the first ones went into the winze hole and some into the level. It was a small piece. It wasn't as large as my head."

Witness further testified that he told Timothy that he better go away from there; that he might get hurt. The deceased was lying on this timber apparently asleep when the rock fell and killed him. The rock was 40 to 50 feet long, 10 to 15 feet wide, and 3 feet high at the thickest place. It is undisputed that the miners were charged with the duty of testing the rock and determining whether it is safe; had examined it that morning, and had determined that it was solid and safe. The end of the stope where Halgreen was at work was perfectly safe. The case was submitted to the jury, who rendered a verdict for the defendant.

*Burritt & Burritt*, for appellant.

*Hanchette & Lawton*, for appellee.

GRANT, J. (*after stating the facts*). 1. The first error assigned is the refusal of the court to excuse a juror who was challenged by the plaintiff because he was an employé of the defendant. We are cited to no case in this court which decides the question. Counsel for defendant rely on *Goodrich* v. *Burdick*, 26 Mich. 39, where the defendant's clerk was excused by the court. It was there said, the court speaking through CHRISTIANCY, C. J.:

"Though it might not have been erroneous for the court to have allowed Stewart, the clerk of the defendant, to sit as a juror, no other cause being shown against him, there was no error in rejecting him for this cause, and we think his rejection judicious and proper."

Probably the reason that the question has not before been raised is because courts usually excuse a juror who occupies a business relation to either of the parties liti-

gant. The question, however, has frequently arisen and been decided in other jurisdictions, and the cases, which are numerous, almost, if not quite, universally hold that such a person is incompetent to sit as a juror. 24 Cyc. p. 276; 17 Am. & Eng. Enc. Law (2d Ed.), p. 1127. Numerous cases are there cited. Jurors should be strictly impartial. Undoubtedly, many employés would be. Many employers might wish them to be. But a verdict in favor of the employer would not be satisfactory to the opposite party. The verdict would be subject to criticism. It would place the juror in an unpleasant position. It is a wise policy which prohibits such persons sitting as jurors. We think the law disqualifies them.

The objectionable juror, however, was peremptorily challenged by the plaintiff, and no claim is made that a perfectly impartial jury was not afterwards obtained. The sole ground, therefore, for reversing the case, is that the plaintiff exhausted all his peremptory challenges, and, if this juror had been excused for cause, he might have had one more peremptory challenge. There are decisions for reversing cases under such circumstances. Among them is one by this court. *Theisen* v. *Johns*, 72 Mich. 285. The question was disposed of by the statement that:

" It will not do to say that this error was cured by the fact that counsel afterwards challenged the jury peremptorily, as it appears from the record that counsel upon both sides exhausted their peremptory challenges. There may have been others upon the jury whom counsel might desire to challenge peremptorily, and have been unable to excuse by reason of having exhausted his challenges."

We think that, when the parties have obtained a competent and impartial jury, there is no good reason in setting that verdict aside and granting a new trial, because the judge erred in retaining upon the jury one who was in fact disqualified, but who was afterwards peremptorily challenged. An impartial jury is all that a party is entitled to, and when he has obtained that he has no valid

ground for complaint.   Where a qualified juror was ex-
cused, this court said:

"So long as an impartial jury is obtained, neither party
has a right to complain of this course by the court."  *At-
las Mining Co.* v. *Johnston,* 23 Mich. 36.

See, also, *Luebe* v. *Thorpe,* 94 Mich. 268.   We therefore
overrule that case upon this point.

2. The court, as requested by the plaintiff, stated to
them fully the theory of the plaintiff's case.   This theory
was repeated in various forms, one of which will be found
in the excerpt from the charge, printed in the margin.[1]
After giving these requests, the circuit judge said to the
jury that they must be satisfied by a fair preponderance
of the evidence of two propositions: (1) that the defendant
was guilty of negligence; and (2) that the plaintiff's in-
testate was not guilty of contributory negligence; that
the duty to warn the deceased was imposed upon the de-
fendant, but, if the deceased knew of and appreciated the
danger, that was sufficient; that if the defendant was
guilty of negligence, and the deceased used the care that
an ordinary, prudent, and intelligent person of his age,
knowledge, and experience would use, plaintiff was en-
titled to recover.   He also instructed them that liability
could not be based upon sympathy.   The last instruction
appears to have been prompted by the remarks of counsel
to the jury.   It is these remarks, in summing up the case
to the jury, of which plaintiff's counsel complain.   We
find no error in them.   The propositions were all correct,
and were all applicable to the case.

---

[1] "If you find from the evidence that deceased was young and in-
experienced, and that the place where he was working when killed
was attended by danger, and that the danger was known, or should
have been known, to the defendant, and was not fully known to
deceased, and was not fully apparent to a person of his age and ex-
perience, or was not fully appreciated by him, and that his incom-
petency to judge of such danger and fully appreciate the same was
known, or should have been known, to the defendant, then the bur-
den of proof is on the defendant to prove to your satisfaction by a
preponderance of evidence that it did fully inform, warn, and in-
struct deceased concerning such danger, so that he might have fully
understood and appreciated the same and have exercised care in
proportion to such danger."

3. Plaintiff made a motion for a new trial upon the grounds: (*a*) That the verdict was against the weight of the evidence; (*b*) that the court erred in his instructions to the jury; (*c*) because an employé of the defendant talked with one of the jurors during the trial, for the purpose of influencing him. The motion was overruled, and, we think, very properly. The verdict was not against the weight of the evidence. The affidavit upon which the talk with a juror is based was denied by the employé and by the juror. Some other errors are assigned which have had full consideration. They are unimportant, and it is sufficient to say that they are without merit.

The judgment is affirmed.

McALVAY, C. J., and CARPENTER, HOOKER, and MOORE, JJ., concurred.