POET v TRAVERSE CITY OSTEOPATHIC HOSPITAL

Docket No. 82941. Argued March 7, 1989 (Calendar No. 4). Decided
    August 22, 1989.

    Barbara Poet, for herself and as next friend of Matthew Poet, and
        Jeffrey R. Poet brought a medical malpractice action in the
        Grand Traverse Circuit Court against Traverse City Osteo-
        pathic Hospital and others, alleging negligence in the prenatal
        treatment of Barbara and in the delivery of Matthew which
        resulted in Matthew being born with significant, permanent
        brain damage. The court, William R. Brown, J., entered judg-
        ment on a jury verdict for the defendants, finding no cause of
        action. The Court of Appeals, WAHLS, P.J., and BEASLEY and
        D. A. BURRESS, JJ., reversed in an unpublished opinion per
        curiam, holding that the trial court erred in refusing to excuse
        a particular juror for cause, thereby requiring the plaintiffs to
        exercise a peremptory challenge to excuse the juror and subse-
        quently precluding the dismissal of another juror by way of a
        peremptory challenge because of exhaustion of their peremp-
        tory challenges (Docket No. 92453). The hospital appeals.

        In an opinion by Justice ARCHER, joined by Justices LEVIN,
    BRICKLEY, and CAVANAGH, the Supreme Court held:

        A trial court commits error requiring reversal when the
    record reveals that (1) the court improperly denied a challenge
    for cause, (2) the aggrieved party exhausted all peremptory
    challenges, (3) the party demonstrated a desire to excuse an-
    other subsequently summoned juror, and (4) the juror whom
    the party wished later to excuse was objectionable.

        1. Due process requires that a civil litigant have a full and
    fair trial on the merits. In certain cases, the litigant may
    request that legal matters be heard by a panel of impartial
    jurors. As part of the process of impaneling an impartial jury, a
    party may challenge a prospective juror for cause, i.e., request
    that the juror not be allowed to become a member of the jury
    for specific reasons. In exercising the challenge, the general and

REFERENCES

Am Jur 2d, Jury §§ 216, 218, 267-269, 294, 298.
See the Index to Annotations under Challenges to Jury; Peremp-
    tory Challenges.

specific disposition of the prospective juror toward the subject matter of the case must be ascertained by the litigant so as to enable a judgment to be formed by the court as to the juror's competency. The challenging party has the burden of showing that the juror has preconceived opinions or prejudice, or such other interest or limitations, enumerated in MCR 2.511(D)(4)-(13), that would impair the capacity to render a fair and impartial verdict. Upon such a demonstration, the trial court must excuse the juror for cause.

2. A trial court's exercise of discretion in ruling on challenges for cause should be made with regard for both the parties and their respective claims. When balancing discretionary power with a litigant's right to a fair trial, in cases where apprehension is reasonable, the trial court should err on the side of the moving party. Apprehension is reasonable when a prospective juror affirmatively articulates a particularly biased opinion which may have a direct effect upon the ability to render an unbiased decision. A challenge for cause should be granted if reasonable apprehension may be alleviated from the mind of the movant and a nonmovant's rights will not be prejudiced. A juror must be dismissed for cause where there is a sufficient reason to believe that at the beginning of the trial the prospective juror is not indifferent, but favors one of the litigants over the other or may be unconsciously influenced by considerations in addition to the evidence presented at trial and the instructions of law. In order to seek relief from a trial court's ruling on a challenge for cause, there must be some clear and independent showing on the record that the court improperly denied a challenge for cause, the aggrieved party exhausted all peremptory challenges, the party demonstrated the desire to excuse another subsequently summoned juror, and the juror whom the party wished later to excuse was objectionable.

3. In order to properly determine whether the trial court has abused its discretion, a reading on appeal of the entire voir dire is essential. While individual factors considered separately may not require that a challenge for cause be granted, a combination of factors may compel dismissal of a prospective juror. The standard for determining abuse of discretion is a result so palpably and grossly violative of fact and logic that it evidences not the exercise of will, but perversity of will; not the exercise of judgment, but its defiance; not the exercise of reason, but rather of passion or bias. In this case there was such abuse. The totality of the background of the prospective juror and her conceded strong personal feelings about damages combined to clearly create the risk of uncompromising bias too great to be .

reasoned away with bare assertions of impartiality. Her admissions on voir dire rendered her presence on the jury objectionable per se. Thus the court's denial of the plaintiffs' challenge for cause was improper. Further, the plaintiffs had exhausted their peremptory challenges and they indicated a desire to excuse a subsequent prospective juror who was objectionable.

Justice BRICKLEY, concurring, also agreed that the practice of testing the jury on specific dollar amount damage awards is not good practice and is within a court's discretion to avoid.

Affirmed and remanded for a new trial.

Chief Justice RILEY, joined by Justice GRIFFIN, dissenting, stated that the trial court did not abuse its discretion in refusing to excuse the juror for cause. When considered in their proper context, the juror's answers do not warrant reversal. Rather, the plaintiff's inquiry was improperly suggestive and inflammatory. The juror's hesitancy in pledging herself to return a verdict of $8 million without hearing any evidence should not be condemned.

Justice BOYLE concurred only in the result reached by Chief Justice RILEY.

1. JURY — VOIR DIRE — CHALLENGES FOR CAUSE — ABUSE OF DISCRETION.

A trial court commits error requiring reversal when the record reveals that (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the party demonstrated a desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable.

2. JURY — VOIR DIRE — CHALLENGES FOR CAUSE.

In exercising a challenge of a prospective juror for cause, the general and specific disposition of the prospective juror toward the subject matter of the case must be ascertained by the litigant so as to enable a judgment to be formed by the court as to the juror's competency; the challenging party has the burden of showing that the juror has preconceived opinions or prejudice, or such other interest or limitations, as enumerated in the court rules, that would impair the capacity to render a fair and impartial verdict (MCR 2.511[D][4]-[13]).

3. JURY — VOIR DIRE — CHALLENGES FOR CAUSE — ABUSE OF DISCRETION — STANDARD OF REVIEW.

The standard for determining abuse of discretion in failing to discharge a prospective juror for cause is a result so palpably and grossly violative of fact and logic that it evidences not the

exercise of will, but perversity of will; not the exercise of judgment, but its defiance; not the exercise of reason, but rather of passion or bias.

*Olds & Mackinder* (by *Douglas J. Mackinder*) for the plaintiffs.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Susan Healy Zitterman*), for the defendant.

ARCHER, J. We granted leave to consider whether plaintiffs were entitled to a new trial as a consequence of the trial judge's denial of plaintiffs' challenge of a juror for cause, where the juror was subsequently dismissed peremptorily.

We hold that a trial court commits error requiring reversal when the record reveals that: (1) the court improperly denied a challenge for cause, (2) the aggrieved party had exhausted all peremptory challenges, (3) the party demonstrated a desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable. Accordingly, because the plaintiffs satisfied all of these factors, we affirm the holding of the Court of Appeals and remand the case to the trial court for a new trial.

### FACTS

On July 18, 1983, appellees Barbara, Jeffrey, and Matthew Poet brought a medical malpractice suit in Grand Traverse Circuit Court against defendant-appellant Traverse City Osteopathic Hospital and defendants M. A. Houghton, Jr., D.O., and the Empire Clinic.[1]

---

[1] The record reveals that an order approving settlement, an order of dismissal, and a stipulation for dismissal of Matthew A. Houghton, Jr., D.O., and Empire Clinic, were executed on January 6, 1986.

Specifically, the action was based on the charge that Dr. Houghton, an employee of the Empire Clinic, was negligent in the prenatal treatment of Barbara and in the delivery of Matthew. Further, the complaint charged that the hospital was negligent in its failure to monitor, supervise, and provide appropriate hospital procedures relating to birth and delivery. The Poets' chief argument was that these negligent acts resulted in Matthew being born with significant, permanent brain damage.

The trial commenced January 6, 1986. Voir dire opened routinely with the court explaining the nature of the case to the venire. Initially six persons were chosen from the venire, and each was questioned first by the court, and then by the attorneys. Early in the questioning, Mr. Ward, counsel for the Poets, addressed the notion of damages as an element of negligence. Likewise, Mr. Hayes, counsel for the hospital, addressed the venire as to their feelings on the substantial damages which might be presented during the course of the trial. There were no significant responses by the venire during this exchange.

Eventually, juror Kathleen Primo was called from the array. She revealed that she was a registered nurse at Munson Medical Center,[2] who worked in utilization management reviewing "neonatal intensive care unit for quality-of-care issues." Ms. Primo responded negatively when asked by the court whether her profession or particular work in the hospital would cause her to be biased. However, when the court asked if there were any inquiries posed earlier to which she would respond differently than the other jurors, she stated, "I

[2] In Traverse City, there are two major hospitals providing service to the public: Traverse City Osteopathic Hospital and Munson Medical Center.

might have different feelings about the elements about compensation."

What followed was a discourse involving juror Primo, the court, and both attorneys, in which Ms. Primo revealed her feelings that there should be a ceiling on damages sought in civil cases. However, after further questioning by all concerned, she resolved that she could be impartial.

Mr. Ward requested that juror Primo be challenged for cause, citing MCR 2.511(D)(5)[3] for support. Mr. Hayes opposed, stating that Ms. Primo's assertion of impartiality rendered her an appropriately fair-minded juror. The court denied the challenge for cause and Mr. Ward excused Ms. Primo peremptorily.

Mr. Ward had exhausted his peremptory challenges,[4] when juror James Bennett was called. Juror Bennett's occupation was that of a medical-surgical supply salesman. During questioning, he revealed that appellant hospital was one of his clients and that several of the witnesses were either personal or business acquaintances. Mr. Ward challenged juror Bennett for cause under MCR 2.511(D)(10) and (12),[5] and was again denied.

---

[3] This court rule provides, in pertinent part:

> (D) Challenges for Cause. The parties may challenge jurors for cause, and the court shall rule on each challenge. A juror challenged for cause may be directed to answer questions pertinent to the inquiry. It is grounds for a challenge for cause that the person:
> (5) has opinions or conscientious scruples that would improperly influence the person's verdict.

[4] MCR 2.511(E)(2) provides, in pertinent part:

> Each party may peremptorily challenge three jurors.

[5] MCR 2.511(D)(10) and (12) provide:

> (D) It is grounds for a challenge for cause that the person:

As a result, Bennett remained on the jury and became the foreman. The jury returned a verdict of no cause of action.

On January 24, 1986, the Poets filed a motion for a new trial, which was denied. They appealed, arguing that the trial court erred in refusing to excuse jurors Primo and Bennett for cause. The Court of Appeals reversed, holding that Kathleen Primo should have been excused for cause, and, because the Poets were thereby precluded from subsequently dismissing James Bennett from the jury by way of peremptory challenge, the trial court's ruling regarding Primo constituted error requiring reversal.[6] We subsequently granted leave to appeal.[7]

I

The guidepost for every trial court procedure is the Due Process Clause of the Fourteenth Amendment of the United States Constitution. It is well settled that due process is primarily concerned with providing a full and fair trial on the merits. See *Ridenour v Bay Co,* 366 Mich 225, 240; 114 NW2d 172 (1962), citing *Grannis v Ordean,* 234 US 385, 394; 34 S Ct 779; 58 L Ed 1363 (1914).

Encompassed within this mandate of fairness and due process is the right of a civil litigant to request, in certain cases,[8] that legal matters be

(10) is the guardian, conservator, ward, landlord, tenant, employer, employee, partner, or client of a party or attorney;

(12) has a financial interest other than that of a taxpayer in the outcome of the action.

[6] *Poet v Traverse City Osteopathic Hosp,* unpublished opinion per curiam of the Court of Appeals, decided January 6, 1988 (Docket No. 92453).

[7] *Poet v Traverse City Osteopathic Hosp,* 431 Mich 870 (1988).

[8] The right to trial by jury is preserved in all cases where it existed

heard by a panel of impartial jurors. Michigan Const 1963, art 1, § 14. Hence,

> [f]airness to the parties litigant demands that the jury should be free from bias and prejudice in all cases, and that they enter upon the trial of the cases with the single desire and purpose of doing equal and exact justice between the parties, and that according to the law and the evidence given them in open court . . . . [*Theisen v Johns,* 72 Mich 285, 292; 40 NW 727 (1888), citing *Monaghan v Agricultural Fire Ins Co,* 53 Mich 238, 246; 18 NW 797 (1884).]

With these fundamental principles in mind, we turn to the difficult task of the trial litigator in accomplishing the selection of a jury. Specifically, at issue is the link between the trial lawyer and the trial judge in procuring an impartial group of jurors: the challenge for cause.

A challenge for cause is defined as

> [a] request from a party to a judge that a certain prospective juror not be allowed to be a member of the jury because of specified causes or reasons. [Black's Law Dictionary (5th ed), p 209.]

In exercising a challenge, the litigator must ascertain the general and perhaps specific disposition of the venire person toward the subject matter of the case. The success of a challenge depends upon eliciting information from the juror, as well as from other sources, as to the juror's state or condition of mind, as will enable a discretionary judgment to be formed by the court as to the juror's competency. *Monaghan, supra* at 246.

Michigan common law provided that a juror was

prior to the adoption of the constitution. *Friedman v Dozowc,* 412 Mich 1, 60; 312 NW2d 585 (1981), citing *Conservation Dep't v Brown,* 335 Mich 343; 55 NW2d 859 (1952).

presumed qualified. *People v Collins,* 166 Mich 4,
9; 131 NW 78 (1911). The challenging party had
the burden of showing that the challenged juror

> ha[d] preconceived opinions or prejudice, or such
> other interests or limitations as would impair his
> capacity to render a fair and impartial verdict. [15
> Mich Law & Practice, Jury, § 68, p 64, citing 2
> Honigman & Hawkins, Michigan Court Rules
> Anno (2d ed), p 466.]

Currently the Michigan Court Rules implicitly
provide that upon a demonstration by counsel that
a prospective juror fits one of the categories enu-
merated in MCR 2.511(D)(4)-(13), a trial court is
required to excuse such juror for cause. This show-
ing is equivalent to proving a biased or prejudicial
state of mind. See, e.g., *McNabb v Green Real
Estate Co,* 62 Mich App 500, 507; 233 NW2d 811
(1975); *Brownell v Brown,* 114 Mich App 760, 766;
319 NW2d 664 (1982); *Bishop v Interlake, Inc,* 121
Mich App 397, 401; 328 NW2d 643 (1982); *Wil-
loughby v Lehrbass,* 150 Mich App 319, 331; 388
NW2d 688 (1986); *People v Lamar,* 153 Mich App
127, 134-135; 395 NW2d 262 (1986); *Cocora v Gen-
eral Motors Corp,* 161 Mich App 92, 95-96; 409
NW2d 736 (1987); *People v Walker,* 162 Mich App
60, 63-64; 412 NW2d 244 (1987).

Ultimately, however, the decision to grant or
deny a challenge for cause is within the sound
discretion of the trial court. *Monaghan, supra* at
245, citing *Atlas Mining Co v Johnston,* 23 Mich
36; 2 Browns 62 (1871); *People v Carrier,* 46 Mich
442; 9 NW 487 (1881). Nevertheless, in exercising
this discretion, the trial judge is not without con-
straint.

> When [discretion is] invoked as a guide to judi-
> cial action it means a sound discretion, that is to

say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by reason and conscience of the judge to a just result. [*Langnes v Green*, 282 US 531, 541; 51 S Ct 243; 75 L Ed 520 (1931).]

In addressing the present circumstance, where a venire person has expressed a strong opinion, yet has resolved that she can be impartial, we believe the trial court's discretionary function should be balanced against its obligation to fulfill each litigant's right to a fair trial. By achieving this balance in each case, the act of a trial judge in granting or denying a request to remove a potential juror should represent a decision ever mindful of the constitutional seriousness involved.

II

In this instance, we are charged with analyzing the exercise of discretion specifically within the context of challenges for cause. In addressing this narrow issue, the Court in *Glasgow v Metropolitan Street R Co*, 191 Mo 347, 356; 89 SW 915 (1905), offered the following:

[T]he authority of the court [in the challenge for cause context] is not limited to a decision of the strict legal question of the qualifications of a juror; it has a discretion to be exercised in the administration of justice in which it may excuse a juror who although not legally disqualified yet whose sitting is reasonably liable to fill either party with an apprehension of unfairness. A court in the exercise of that discretion will not attempt to allay an unreasonable suspicion, but when it can remove a cause of reasonable apprehension on the one side without injuring in any degree the rights of the other or giving the other cause for similar

reasonable apprehension, it is the right and duty of the court to do so, and when in that respect the court exercises a sound judicial discretion its ruling will not be disturbed. [See also *Lee v Misfeldt,* 1 Mich App 675, 679; 137 NW2d 753 (1965), citing 2 Honigman & Hawkins, Michigan Court Rules Anno (2d ed), p 466.]

We agree that a trial judge's exercise of discretion in ruling on challenges for cause should be made with regard for both the parties and their respective claims. When balancing discretionary power with a litigant's right to a fair trial, a trial judge should, in cases where apprehension is reasonable, err on the side of the moving party.[9] For our purposes, apprehension is "reasonable" when a venire person, either in answer to a question posed on voir dire or upon his own initiative, affirmatively articulates a particularly biased opinion which may have a direct effect upon the person's ability to render an unaffected decision.

As expressed by the Missouri Supreme Court in *Glasgow, supra,* we, likewise, opine that if reasonable apprehension may be alleviated from the mind of the movant, and a nonmovant's rights will not be prejudiced, a challenge for cause should be granted. There are simply too many unbiased and otherwise qualified individuals eligible to sit on any given jury to quibble over persons who have

[9] The Supreme Court of the United States in *Reynolds v United States,* 98 US 145, 155; 25 L Ed 244 (1878), offered the following oft-quoted guide:

"[L]ight impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but . . . those strong and deep impressions, which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him."

voluntarily articulated a grave potential for bias. This is not to suggest that challenges for cause should be freely or liberally granted but,

> [w]here there is a sufficient reason to believe that at the beginning of the trial the prospective juror is not indifferent, but favors one of the litigants over the other *or* may be unconsciously influenced by considerations in addition to the evidence presented at trial and the instructions of law, the juror must be dismissed for cause. [*Blades v Da-Foe,* 704 P2d 317, 324 (Colo, 1985). Emphasis added.]

In addition to the initial challenge for cause quagmire, the case at bar presents the additional problem arising when a trial court's exercise of discretion in denying a challenge for cause creates the situation where a peremptory challenge is necessarily forfeited without choice. The Court of Appeals in *Bishop v Interlake, supra* at 403, espoused the following in addressing the predicament:

> In situations where a challenge for cause is improperly denied, a party has been "prejudiced," if at all, simply by being improperly compelled to use a peremptory challenge. He is thus denied an opportunity to act on his intuitions at a later time during voir dire by having prematurely exhausted his peremptory challenges.[10]

---

[10] See *Crawford v Manning,* 542 P2d 1091, 1093 (Utah, 1975). The court stated:

> By exercising one of their peremptory challenges upon this prospective juror, plaintiffs had only two remaining.
>
> \* \* \*
>
> A party is entitled to exercise his three peremptory challenges upon impartial prospective jurors, and he should not be compelled to waste one in order to accomplish that which the trial judge should have done.

We agree that a degree of prejudice can be presumed when a party is improperly compelled to use a peremptory challenge. The very purpose of this challenge is to provide an unrestricted opportunity to excuse any juror without assigning a reason. We also concur that the peremptory challenge was not designed to function as an alternate mode of dismissal in the event of improperly denied challenges for cause. Nonetheless, presumed prejudice does not, in our view, necessarily rise to the level of actionable prejudice. As previously noted, the nature of the trial court's duty here is discretionary. Therefore, in order to give due deference to decisions made in this context, we believe additional proof of prejudice should be required.[11] Thus, in order to uniformly determine when a trial court's error in overruling a challenge for cause requires reversal, we will henceforth focus on the causal relationship between an erroneous denial, its effect upon the availability of allotted peremptory challenges, and how each of

---

We are of the opinion that there was prejudicial error in the matter complained of and that a new trial should be granted.

See also *Wasko v Frankel,* 116 Ariz 288, 290; 569 P2d 230 (1977) (en banc) ("forcing a party to use his peremptory challenges to strike jurors who should have been stricken for cause denies the litigant a substantial right"); *Blades v DaFoe, supra* (the right to exercise peremptory challenges is a substantial right and was not intended as a remedy for trial court errors); *Veach v McDowell,* 133 Ind App 628, 633-634; 184 NE2d 149 (1962) ("denial of a right of peremptory challenge is prejudicial per se and harmful . . . to impanel a jury in violation of law, in such a way as to deprive a party of his right to peremptory challenge, constitutes reversible error"); *Wilson v Ceretti,* 210 NW2d 643 (Iowa, 1973).

[11] In tackling the problem presented here, there are several other solutions offered in other jurisdictions. See, e.g., *Miles v FERM Enterprises,* 29 Wash App 61; 627 P2d 564 (1981) (exhaustion of peremptory challenges is all that it needed to be shown to seek relief); *Liebman v Curtis,* 138 Cal App 2d 222; 291 P2d 542 (1955) (exhaustion supported by an affidavit stating a desire to have exercised forfeited peremptory challenges); *Caruso v Local Union No 690,* 107 Wash 2d 524; 730 P2d 1299 (1987) (actual showing of prejudice necessary).

these factors influenced the ultimate composition of the jury in question.

Accordingly, in the interest of requiring an independent and objective manifestation of actionable prejudice,[12] we hold that in order for a party to seek relief in this instance, there must be some clear and independent showing on the record that: (1) the court improperly denied a challenge for cause,[13] (2) the aggrieved party exhausted all peremptory challenges,[14] (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable.[15]

[12] See *Longshore v Fronrath Chevrolet,* 527 So 2d 922, 924-925 (Fla App, 1988). The court reasoned that a trial court's erroneous denial of a challenge for cause will not be deemed to constitute error requiring reversal unless the party making the challenge was prejudiced by being required to accept an objectionable juror—one which the party otherwise would have peremptorily challenged; *Arkansas State Hwy Comm v Dalrymple,* 252 Ark 771, 772; 480 SW2d 955 (1972) (Appellant "made no showing that he would have struck the name of any other juror if he had had a peremptory challenge left. . . . [U]ntil such time as a party is forced to take an objectionable juror without the privilege of exercising a peremptory challenge, he has shown no prejudice. . . . Here . . . appellant does not contend that any of the jurors who served were disqualified."); *Physicians & Surgeons Gen Hosp v Koblizek,* 752 SW2d 657 (Tex App, 1988) (complaining party must advise trial court he will exhaust peremptory challenges and specific objectionable jurors will remain); *Colbert v Journal Publishing Co,* 19 NM 156, 160-161; 142 P 146 (1914).

[13] The determination of whether a trial court has improperly denied a challenge for cause will be made in accordance with whether a juror is excusable per se under MCR 2.511(D).

[14] See *Mellinger v Prudential Ins Co,* 322 Mich 596, 609; 34 NW2d 450 (1948). ("The rule in this State is that a party cannot complain of error in the overruling of a challenge for cause if it does not force him to exhaust his peremptory challenges.")

[15] In order for a party to establish that a potential juror is objectionable, there must, first, be a specific indication, on the record, that the party seeking removal finds the individual objectionable. Second, the objector must expressly articulate or list the particular reasons why the juror is objectionable.

Furthermore, as the term "objectionable," defined in *The Random House Dictionary of the English Language: Unabridged Edition* as "causing or tending to cause an objection, disapproval or protest" lends itself to the concededly imprecise "know it when one sees it"

III

A

The primary contention of appellees Barbara and Jeffrey Poet is that but for the trial court's error in refusing to excuse juror Primo for cause, juror Bennett would have been excused peremptorily. Conversely, the appellant hospital maintains that Ms. Primo's assertion that she could be impartial was sufficient to support the trial court's discretionary decision to deny dismissal for cause.

In order to properly determine whether the trial judge has abused his discretion, "[a] reading of the entire voir dire is essential . . . ." *Andrews v Mosley Well Service,* 514 So 2d 491, 497 (La App, 1987). "[W]hile individual factors considered separately may not require that a challenge for cause be granted, the combination of factors may compel dismissal of the jurors." *Blades, supra* at 324. Accordingly, the trial judge's exchange with juror Primo revealed the following:

> *Bailiff:* Kathleen Primo, Number Fifty-Five.
> *The Court:* Kathleen Primo, have you ever been a juror before?
> *Juror Primo:* No, I have not.
> *The Court:* Do you have any acquaintances among any of the persons that we have introduced and expect to see as part of this trial?
> *Juror Primo:* Yes, I do. I work at Munson Hospital. I'm an R.N. there and so I'm familiar with some of the physicians, not personally, but I'm acquainted with them. I am also an acquaintance with [sic] the representative of Osteo who is here.

standard, we submit that a determination of objectionableness does not *require* proof that a potential juror be excusable for cause. See *Longshore,* n 12 *supra* at 924. However, the articulated reasons should include factors which amount to more than mere triviality, i.e., juror Doe is objectionable because the juror is wearing bright orange jewelry or a punk rock hair cut.

*The Court:* I must inquire further what unit of the hospital do you work.

*Juror Primo:* I work in utilization management, and I work very closely with the wife of the representative of Osteo. *I also am responsible for reviewing cases in the neo-natal intensive care unit for quality-of-care issues.*

*The Court:* I would take it then that you would have some independent knowledge of procedures, standards of conduct in both the obstetric procedures and in the—as well as in the neo-natal unit.

*Juror Primo:* Yes.

*The Court:* Perhaps first we should deal with the matters of personal acquaintance. Do you feel that any of the acquaintances that you have identified would be of such nature that you would have a preconceived notion of how to receive or how to accept their testimony or would identify in such a fashion that you would give greater or lesser weight to any of that testimony because of your past relationship with them?

*Juror Primo:* No, I do not.

*The Court:* And then the more general question, because of your employment, your association with a hospital and particularly the type of hospital, do you feel it would impart to you any [tendency] of bias one way or the other in terms of the evaluation of the standards which will become part of this case?

*Juror Primo:* No, I don't.

*The Court:* Has your work in Munson brought you into any contact with the Plaintiffs or the care and treatment of the infant, Matthew?

*Juror Primo:* No. I was in a completely different department at that time and so I wasn't doing the type of work then that I am now.

*The Court:* So you had not, prior to today, heard anything of the name or treatment of Matthew Poet?

*Juror Primo:* No, I hadn't.

*The Court:* We have covered a number of subjects, including those of the considerations, the

philosophy that goes into the type of case, the liability considerations and basis upon which liability might or might not exist. *Are there any of those inquiries where you feel that your response to the questions of the Court or Counsel would have been significantly different than the persons seated around you, the other persons seated in the jury box?*

*Juror Primo: I might have different feelings about the elements about compensation.*

*The Court:* You may have some difficulty with the concept of compensation as predicated upon fault?

*Juror Primo:* I don't think it would affect my feelings regarding the judgment of fault. It's just the amount of compensation I might have different feelings about.

*The Court:* I see, and if in that regard the proofs were such that it established to the satisfaction of you and your fellow jurors that there was liability and that a certain number—a certain dollar amount of damages was appropriate, would you feel your hesitation is such that you would not be able to award that type of verdict?

*Juror Primo:* It might. I guess if it meant that you make a judgment that it's guilty, then it's eight million dollars, or can somebody be guilty and be a lesser amount—I'm not familiar with how cases like this—

*The Court:* Allright [sic]. I guess there are a couple of areas of terminology that might be troublesome to us who deal with this on a daily basis. When we speak of someone being at fault, we generally would not use the term guilty, because we think of that in terms of a criminal case. The Jury will have the responsibility of determining the issues of fault and causation, as well as then if they arrive at the point of fault and causation, then of determining damages, and so it is conceivable that the Jury could, based upon [sic] those findings, be called upon to make an award of damages in whatever amount that the Jury finds is appropriate, or the Jury could be, on that rea-

soning, called upon to award nothing on a finding
of no fault or cause. Those choices then, based
upon [sic] the evidence as presented and the
Court's instruction, will be the decision of the
Jury. Now, knowing that those are the possibili-
ties, do you feel that you have preconceived no-
tions that would interfere with your fairly assess-
ing and judging those facts?

*Juror Primo:* No, I do not.

*The Court:* Generally then, from any of the
inquiries made by the Court or Counsel, are you
aware of anything that would impair your ability
to fairly sit as a juror in this case?

*Juror Primo:* No, I don't. [Emphasis added.]

At the conclusion of the court's inquiries, Mr.
Ward, counsel for the Poets, posed the following:

*Mr. Ward:* Mrs. Primo, you said you are in-
volved in reviewing cases for the hospital in neo-
natal?

*Juror Primo:* Currently in-patient.

*Mr. Ward:* Does that cause you to review any
obstetrical matters?

*Juror Primo:* Infrequently I have, but not on a
routine basis.

*Mr. Ward:* Have you ever worked as an obstetri-
cal nurse?

*Juror Primo:* No.

*Mr. Ward:* Have you ever had any training in
obstetrics?

*Juror Primo:* Just in nursing school.

*Mr. Ward:* Do you have a working relationship
at all with anybody from Traverse City Osteo-
pathic Hospital?

*Juror Primo:* No.

*Mr. Ward:* Do you discuss medical matters with
anybody from Traverse City Osteopathic Hospital?

*Juror Primo:* No.

*Mr. Ward:* How is it that you know—you said
you knew someone from Traverse City Osteo-
pathic?

*Juror Primo:* I work closely in the same department with the representative from Osteopathic Hospital, Mr. Hooper's wife, and I have met Mr. Hooper on occasion very briefly.

*Mr. Ward:* Would it cause you any difficulty in that relationship if you decided after the close of the proofs that a verdict in favor of the Plaintiffs was warranted and that's what you came back with? Would you have difficulty in dealing with these people?

*Juror Primo:* No, I would not.

*Mr. Ward: Do you have an opinion somehow that damages should be limited to a certain ceiling?*

*Juror Primo:* Yes, I do.

*Mr. Ward: You do. Allright [sic]. Some of the elements of damage that will be claimed by the Plaintiffs include pain and suffering. Is that an area in which you might feel there should be a certain ceiling?*

*Juror Primo:* Yes, I do.

*Mr. Ward: Do you have strong personal feelings about that or professional feelings?*

*Juror Primo:* Fairly, yes.

*Mr. Ward:* Would it be difficult then for you to come back with an extensive award for those elements of damage?

*Juror Primo:* I think I would have to be presented with everything first to really say that for sure.

*Mr. Ward:* But you might have a problem in that area?

*Juror Primo:* I might have a problem.

*Mr. Ward:* And you might have difficulty now, not knowing what the evidence is going to be—you know, now you might have difficulty being objective in that area?

*Juror Primo:* In the amount, yes. I don't think I would be—I think I'll be very objective in the decision of whether there was fault.

*Mr. Ward: But if we—when you make that finding and if we get to the amount, you may or may not have problems being objective?*

*Juror Primo: Yes.*

*Mr. Ward:* And it's difficult to tell right now until you've heard everything?

*Juror Primo: Yes.*

*Mr. Ward: But you know you might have that problem?*

*Juror Primo: I might, yes.*

*Mr. Ward:* Nothing further, Your Honor. [Emphasis added.]

Mr. Hayes, counsel for the hospital, countered:

*Mr. Hayes:* I take it that it's just as possible, without knowing what you are asked to make a judgment on, that you might not have a problem too, is that correct?

*Juror Primo:* That's true.

*Mr. Hayes:* Do you have any feeling to the effect that if something does go wrong, that somebody must be at fault?

*Juror Primo:* No, I don't.

*Mr. Hayes:* Do you have any feeling to the effect that sometimes things happen without fault for reasons that nobody really knows anything about and can't do anything about?

*Juror Primo:* I can see that that does happen sometimes.

*Mr. Hayes:* Thank you, ma'am. I have nothing further, Your Honor.

At the close of questioning juror Primo, the court entertained Mr. Ward's challenge for cause.

*Mr. Ward:* Plaintiff challenges Mrs. Primo for cause based on [sic] MCR 2.511(D)(5) in that she's indicated she has opinions or conscientious scruples that would improperly influence her verdict and that she's indicated she might be unable to be objective when it comes to the issue of damages, and, therefore, having that concern, I think it encumbant [sic] she be excused in that she might

not be able to render a fair and impartial verdict
on all the elements in this matter.

Mr. Hayes opposed, stating:

> *Mr. Hayes:* I would oppose that, Your Honor. I
> would compliment Mrs. Primo on her candor on
> freely acknowledging to all that she might have
> that problem, but she also said that she might not.
> She's going to do exactly what she's supposed to
> do, wait and see, and she's honest enough to tell us
> she might and she might not. She won't know
> until she gets there. I don't think anybody can ask
> for more than that. She's not said she does have a
> definite problem. She acknowledges only that she
> might or might not have some; she would have to
> wait until she got to that point.

Mr. Ward's rebuttal:

> *Mr. Ward:* Your Honor, I do think what she
> stated falls within the challenge I've cited and
> that she has opinions that would improperly influ-
> ence her verdict and make her unobjective. She
> has stated she has opinions regarding awards of
> damages, and that's the purpose of selecting the
> jury ahead of time, to find these things out, rather
> than when it's time for deliberations, to have a
> juror say wait a minute; I can't be objective. We
> don't think we want to wait until we find that out
> at that point in time.

At this time, the court engaged in one final
colloquy with juror Primo:

> *The Court:* I guess, without intending to pick on
> you, I'm prompted to make some further inquiry,
> if I may. You've indicated some difficulty in your
> consideration of damage amount if you arrive at a
> consideration of damage. *Is that predicated upon
> some prior position in your mind that there is an*

*absolute limit or that there should be a fixed limit of damages that might be awarded in such a case?*

*Juror Primo: I have feelings that there should be a ceiling on damages.*

*The Court:* Knowing that that does not exist within our frame-work of law and if the case were one which proved to you damages of an amount that exceeded what you have a belief should be a fixed limitation, would you be able to fairly address the subject, consider the damages, and make an award, even though it might be above or below the figure that you believe should be a fixed limitation?

*Juror Primo:* It would not affect my feelings as far as the decision of who is at fault, and once that decision is made, then, from what I understand, it's the members of the Jury who decide on the amount.

*The Court:* Right.

*Juror Primo:* I think I would have to listen to everything that was presented before I could say that, yes, I could say eight million dollars. I don't know that. It would just depend on all of the evidence.

*The Court:* But if the evidence were such that it were persuasive enough to you and your fellow jurors that there was both liability and an amount which exceeded what you feel should be a limitation, but was established by the evidence, you could award that amount?

*Juror Primo:* This is not a decision I would make by myself, anyway.

*The Court:* Right. You would do so collectively.

*Juror Primo: I would probably have strong feelings about awarding eight million dollars, yes, even if liability were established and everything.*

*The Court:* I think it would be fair to state that anyone would have certain reluctance, but to go back to your prior indication, would it be difficult, because of the size of that figure or because it— would you be limited by what you believe should be an absolute limitation?

*Juror Primo:* The size of the figure. [Emphasis added.]

Following the denial of this challenge for cause, counsel removed Mrs. Primo peremptorily, his second peremptory challenge. Another potential juror replaced Ms. Primo and following the questioning, Mr. Ward peremptorily excused juror Robert Keller, his third and final challenge.

Replacing Mr. Keller was juror James Bennett, a medical-surgical supply salesman. During his questioning, he revealed that the appellant hospital was one of his clients; that he was acquainted through his business with witness Walter J. Hooper, vice president of the hospital; and finally that he was personal friends with witnesses Drs. Houghton and Sprunk, as well as other testifying physician witnesses.[16] When asked whether these business and personal relationships would impair his objectivity or cause him to give special consid-

---

[16] The following pertinent exchange occurred between the court and juror Bennett:

*The Court:* Do you have any acquaintances, relationships that would involve you and the parties or Counsel or witnesses to this case?

*Juror Bennett:* Yes, sir.

*The Court:* Who is that?

*Juror Bennett:* I'm acquainted with Osteopathic Hospital. I sell to them. I'm a medical-surgical medical-supply salesman.

*The Court:* I see. I take it you likewise do so with Munson.

*Juror Bennett:* Yes.

*The Court:* And probably with any other hospitals in the area?

*Juror Bennett:* That's correct, sir.

*The Court:* Do you have—with whom do you have acquaintance, either of the persons introduced here today as representatives of the hospital?

*Juror Bennett:* Yes, sir.

*The Court:* You do know them?

*Juror Bennett:* Mr. Hooper, yes.

*The Court:* Do you have any social relationship as well as a business relationship involving Mr. Hooper?

*Juror Bennett:* No, sir, purely business.

* * *

eration to certain testimony, Mr. Bennett replied,
"No sir, I don't believe so."

### B

Our duty here is to determine whether the trial
court abused its discretion and whether such
abuse, if present, warranted a new trial. Conse-
quently, our analysis turns to the standard set
forth in *Spalding v Spalding,* 355 Mich 382, 384-
385; 94 NW2d 810 (1959):

> In order to have an "abuse" . . . , the result
> must be so palpably and grossly violative of fact
> and logic that it evidences not the exercise of will
> but perversity of will, not the exercise of judgment
> but defiance thereof, not the exercise of reason but
> rather of passion or bias.

We find that the line separating abuse from
properly exercised discretion was, in this particu-
lar instance, crossed. We stress that our singular,
most important concern in cases where there is an
objection to the exercise of discretion by trial
courts in the challenge for cause context is
whether the resulting jury could, without signifi-
cant question,[17] provide the parties with a fair
trial.[18]

---

*The Court:* Is there anything that we have covered in our
discussion that you feel would be especially applicable to you
and would cause you reason to question your ability to be fair
and objective as a juror?
*Juror Bennett:* I'm personal friends with Doctor Sprunk and
also know Matthew Houghton quite well, some of the other
physicians.

[17] We do not strive with this opinion to, in any way, raise the
standard of juror qualification. Admittedly, there is no such thing as a
"perfect" jury. However, *"fairness to the parties litigant," must*
continue to be the paramount concern in juror selection. The United
States and Michigan Constitutions have historically set this pace, and
we must, barring all, steadfastly adhere to it.

[18] See *Longshore,* n 12 *supra* at 923. ("Unless the error infects the
ultimate fairness of the trial so that the litigant is thereby deprived

In the present case, juror Primo was required to be excused under MCR 2.511(D)(5). The failure of the court to do so denied the Poets the use of a later peremptory challenge to excuse juror Bennett, who became the foreman of this six-person jury. Despite the fact that the jury's verdict in this case was six to zero, there is, of course, no way for this Court or the lower courts to know how juror Bennett's general presence, personal knowledge, or expertise in the area explored at this trial, affected the other jurors during their deliberations.[19] We maintain, however, that the risk of influence was unacceptably high, if not imminent.

The court's error in refusing to excuse juror Primo was an abuse of its discretion principally because her own admissions on voir dire rendered her presence on the jury objectionable per se.[20] Thus, we indeed find that the trial court's action opposed any exercise of reason and was "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of

---

of trial by a jury of his or her peers, the error will be considered harmless.")

[19] The juror which remained because the plaintiffs had no challenge to remove him may have been a hawk amid seven doves and imposed his will upon them. [*Crawford,* n 10 *supra* at 1093.]

[20] Juror Primo was required to be excused under MCR 2.511(D)(5). At the conclusion of the voir dire discussion with her, she herself characterized the nature of her feelings with, "I would probably have *strong* feelings about awarding eight million dollars, yes, even if liability were established and everything." See p 249. She simply would not bend. Thus, our decision that the trial court committed error in refusing to excuse her for cause is without reservation.

will."[21] *Spalding, supra* at 385.[22]

IV

A

The totality of the following factors further supports our finding of abuse here. In satisfying the first requirement, that the court improperly denied the challenge for cause, the totality of Primo's profession as a registered nurse, her special skill in reviewing quality-of-care issues in neonatal intensive care cases, her close working relationship with the wife of the hospital vice-

---

[21] Despite its steadfast presence in Michigan jurisprudence, the continued applicability of the *Spalding* standard of review to civil cases in general has been questioned. See *Southfield Police Officers Ass'n v Southfield,* 433 Mich 168; 445 NW2d 98 (1989) (BOYLE, J., dissenting.) However, we leave the full discussion of this topic for a later day.

[22] In civil cases, the courts are divided as to findings of abuse in this context, depending on the specific facts of each case. *Tacke v Vermeer Mfg Co,* 220 Mont 1; 713 P2d 527 (1986) (trial court abused discretion in refusing a challenge for cause to a juror whose husband sold a particular type of baler which allegedly injured the plaintiff); *West Virginia Dep't of Hwys v Fisher,* 289 SE2d 213 (W Va, 1982) (physician-patient privilege existed between a party and a prospective juror; although not disqualification per se, the likelihood of bias or prejudice was sufficient to require the verdict to be set aside); *Alabama Power Co v Henderson,* 342 So 2d 323 (Ala, 1976) (not abuse for the trial court to fail to exclude a juror who said he had been drinking the morning of selection); *Malvo v J C Penney Co,* 512 P2d 575 (Alas, 1973) (action against a department store for false imprisonment; failure to grant the plaintiff's challenge to jurors with outstanding balances on their charge accounts was prejudicial to the plaintiff who had used all peremptory challenges); *Rauscher v St Benedict's College,* 212 Kan 20; 509 P2d 1137 (1973) (where the trial judge senses that a prospective juror may be casting answers on voir dire in a manner designed to secure that he be excused, there was no abuse in the court's failure to excuse the juror); *Barb v Farmers Ins Exchange,* 281 SW2d 297 (Mo, 1955) (in a personal injury action where matters which might have established disqualification were gone into on voir dire and selected venireman is deceptive, there can be no fair trial).

We recognize, however, that in criminal cases, courts in other jurisdictions almost unanimously uphold trial court decisions to grant or deny a defendant's motion to dismiss for cause. See, e.g., *United States v Jones,* 865 F2d 188 (CA 8, 1989); *Andrews v Indiana,* 529 NE2d 360 (Ind App, 1988); *People v Drake,* 748 P2d 1237 (Colo, 1988); *United States v Murray,* 618 F2d 892 (CA 2, 1980); *McGee v Alaska,* 614 P2d 800 (Alas, 1980); *People v Earnest,* 53 Cal App 3d 734; 126 Cal Rptr 107 (1975); *Arizona v Sorrell,* 95 Ariz 220; 388 P2d 429 (1964).

president, her acquaintance with the vice-president himself, a witness in this case, and her conceded "fairly" "strong personal feelings about" damages,[23] render the risk of uncompromising bias clear. As we stated in *Fisher v Bernard,* 386 Mich 182, 186; 191 NW2d 323 (1971), "[t]he scruples of conscientious jurors can be as debilitating as any other impediment to impartiality." Further, these characteristics produced a taint of bias too great to be reasoned away with bare assertions of impartiality.[24]

_____

[23] In order for this Court to determine whether there was an abuse of discretion in this case, we considered personal characteristics which were necessarily collateral to and inextricably bound with the overall resolution of the issues appealed, i.e., whether juror Primo's strong personal feelings about damages, justified removing her for cause, and whether the trial court's refusal to do so was an abuse of discretion. We did not and do not consider it necessary to sever characteristics of a juror in order to reach a decision. Thus, we underscore that appellate consideration of juror qualification issues requires the review of a "combination of factors." *Blades, supra* at 324.

While the dissent makes the observation that our consideration of the "totality" of juror Primo's characteristics is inappropriate, we respectfully disagree. We believe it no coincidence that juror Primo was the only juror who voluntarily offered her negative feelings about the damages sought here. Indeed, we specifically surmise that the very nature of her total characteristics directly effected and perhaps even prompted her decision to articulate distaste for the size of the proposed verdict. Thus, again, we maintain that our consideration of the "totality" of any juror's characteristics on appellate review in this context, is justified and essential.

[24] There are a number of jurisdictions that have spoken in agreement with this premise. For example, the Supreme Court of Missouri reasoned, "Where a juror admits . . . that he had a prejudice . . . and that that prejudice existed up to the time he gave his first answer upon his voir dire, *yet,* after being examined and cross-examined by counsel and the court, . . . to say that he could divest his mind of such a prejudice and fairly try a case, and that the prejudice had become dissipated within the last five minutes, it can scarcely be reasonably said that such a juror fills the requirements of our system of jurisprudence." *Moore v Middlewest Freightways, Inc,* 266 SW2d 578, 586 (Mo, 1954). Further, in Virginia, the court noted, "The juror may state and honestly believe that he is free from all bias, and yet it may appear from his own or from extraneous evidence, or both, that such may not be the fact." *Chesapeake & O R Co v Smith,* 103 Va 326, 328; 49 SE 487 (1905). Finally, in Oregon, "[i]nitial reactions or

B

Turning to the question whether the error in failing to excuse juror Primo requires reversal, we conclude it does. The record reveals that the plaintiffs met the second requirement of the test in that they had exhausted their peremptory challenges.[25] When juror Bennett was summoned to the venire, the peremptory challenge which the plaintiffs were compelled to use on juror Primo would have been available for use but for the improper denial of the challenge for cause.

After the voir dire questioning of juror Bennett, the plaintiffs' motion to remove him for cause under MCR 2.511(D)(10) and (12), was denied. The plaintiffs, therefore, satisfied the third requirement.[26] Lastly, because juror Bennett admitted having personal relationships with multiple defense witnesses in this case, in addition to his business relationships with appellant hospital as a medical supply salesman, the fourth requirement was satisfied.

We believe there were two injuries here, one primary and one secondary. The primary injury, of

answers given in voir dire without undue debate and confinement of issues should be afforded much greater weight in determining [a juror's] true frame of mind. Early answers or reactions more truly indicate the juror's frame of mind as opposed to later generalized statements that the juror would be fair." *Lambert v Sisters of St Joseph of Peace,* 277 Or 223; 560 P2d 262 (1977).

[25] In addressing Mr. Ward's subsequent use of his third peremptory challenge to excuse juror Keller, again we stress that it is not within our power to pass on whether the use of this peremptory challenge was wise or imprudent. The importance of the unencumbered use of peremptory challenges has long been recognized and affirmed by this Court. *People v Miller,* 411 Mich 321; 307 NW2d 335 (1981).

[26] We stress that a party need only demonstrate on the record a *desire* to excuse another subsequently summoned juror. The manifestation of this desire may be a motion to challenge for cause, a request for additional peremptory challenges in the case of exhaustion, or a simple expression of dissatisfaction with a juror who cannot be excused because of improperly compelled exhaustion.

course, was the failure to excuse juror Primo for cause, which denied the later use of a peremptory challenge. We further believe, however, that the facts of this case clearly illustrate the secondary danger that inherently exists when such an injury befalls a party, i.e., the fact that the challenge to juror Primo was denied forced the Poets' counsel to use a peremptory challenge to excuse her, and, as a result of that affront, the Poets' right to an impartial jury was immediately placed in jeopardy. Although there is no constitutional right to a certain number of peremptory challenges,[27] the practical matter here is that the resulting jury was not impartial because of the relationship between the trial court's denial of the challenge for cause and the later objectionable presence of juror Bennett.[28]

Finally, the appellant hospital asserts that because juror Primo was excused from the venire by way of peremptory challenge, any error committed by the trial court in overruling her challenge for cause was harmless.[29] In support of this position,

---

[27] See *Ross v Oklahoma,* 487 US 81; 108 S Ct 2273; 101 L Ed 2d 80 (1988).

[28] See *Miles v FERM Enterprises,* n 11 *supra* at 64. ("A litigant's constitutional rights are invaded when he is required to exhaust his peremptory challenges on a juror who should have been dismissed for cause. The failure to dismiss for cause is prejudicial in itself without regard to whether the final peremptory might have been used to dismiss another juror who sat on the panel.")

Again we note that the general position espoused in *Bishop, Crawford, Wasko, Veach* and *Ceretti, supra,* is sound in establishing that an ample degree of prejudice exists even in the absence of an additional independent showing of such prejudice. See also *Carter v Beasley,* 285 Ala 9; 228 So 2d 770 (1969); *State v Singletary,* 80 NJ 55; 402 A2d 203 (1979).

[29] The gist of the appellant's argument in this regard is that because the jury returned a verdict of no cause of action, the issue of damages was never reached and therefore any error committed in failing to excuse juror Primo was harmless. The flaw in this reasoning is twofold:

First, it is elementary that in personal injury cases there are two

*Pearce v Quincy Mining Co,* 149 Mich 112; 112 NW 739 (1907) is cited.

*Pearce* involved a trial court's denial of a party's challenge for cause where the juror in question was later excused peremptorily. In addressing how the exercise of the later peremptory challenge effected the case, we held:

> An impartial jury is all that a party is entitled to, and when he has obtained that he has no valid ground for complaint.[30]

We do agree with the general theory operating in *Pearce,* that all litigants are constitutionally entitled to an impartial jury. However, the specific rationale in *Pearce* is flawed in that the court did not, at that time, recognize that a degree of prejudice can be presumed even when an impartial jury results. Thus, in light of the viability and logic found in *Bishop* and its cross-jurisdictional counterparts, we find that *Pearce* neither reflects the subsequent evolution of the law involving the

equally major issues: liability *and* damages. As a practical matter, juror Primo's adamant assertion that there should be a cap on damages would necessarily have affected her reasoning as to the complete resolution of the case. Second, our assessment of error addresses juror "selection," i.e., error occurring at the time selection took place. Thus, because the selection error involving juror Primo resulted in juror Bennett remaining on the jury, such error was not harmless.

30 Principally, the *Pearce* Court attempted to overrule a premise introduced in *Theisen, supra* (" 'It will not do to say that this error was cured by the fact that counsel afterwards challenged the jury peremptorily . . . .' " *Pearce* at 116-117, citing *Theisen*), and later developed in *Bishop, supra,* to the effect that prejudice cannot inherently be presumed simply by the denial of the use of a peremptory challenge if an impartial jury results. In our view, however, the Court in *Pearce* succeeded only in placing a limitation on when litigants may establish error requiring reversal, i.e., if a party utilizes a peremptory challenge to excuse a venire person who has previously been unsuccessfully challenged for cause, there is no ground for complaint if the later peremptory excusal results in an impartial jury.

peremptory challenge as a substantial right,[31] nor indicates factually whether the aggrieved party wished to later challenge another juror and could not, as in the instant case. For these reasons, we find that *Pearce* is not completely dispositive of the questions presented here.

Indeed, the sum total of Mr. Bennett's personal and business relationships with several testifying witnesses, including the hospital itself, jeopardized the integrity of the entire trial.[32] Consequently, in the interest of fulfilling our duty to insure that litigants in this state are given the opportunity to have their disputes heard by a fair and impartial jury, we conclude that the trial court erred so as to require reversal in failing to excuse juror Primo for cause because the record supports that the effect of the failure was to deny the later use of a peremptory challenge, which, in this case,[33] forced the endurance of an objectionable juror.

### CONCLUSION

In light of our consideration above, we hold that a trial court commits error requiring reversal when the record reveals that: (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the

---

[31] See *People v Miller,* n 25 *supra.*

[32] We emphasize that the appellant did not appeal as to juror Bennett. Nevertheless, our review of juror Bennett's qualification is essential, in this instance, solely for the purpose of properly and completely analyzing the effect the trial court's error had on the subsequent construction of this jury. Our assessment is not, impliedly or otherwise, an attempt to affirm or reverse the lower court's ruling that Mr. Bennett did not meet the criterion for dismissal contained within MCR 2.511(D)(10) or (12). Our focus, rather, is on the causal relationship between the court's refusal to dismiss juror Primo for cause and the later objectionable presence of juror Bennett.

[33] We stress that the application of the legal principles contained herein must be made with due consideration to the totality of the circumstances of each individual case.

party demonstrated a desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable.

Accordingly, because the party in the case at bar satisfied all these factors, we affirm the result of the Court of Appeals and order a new trial.

LEVIN, BRICKLEY, and CAVANAGH, JJ., concurred with ARCHER, J.

BRICKLEY, J. I have signed and concur in the opinion of Justice ARCHER, but wish to express an agreement with one aspect of the dissent of Chief Justice RILEY. While I do not think it was the gravamen of the juror's bias in this case, the practice of testing the jury on specific dollar amount damage awards is not a good practice and is certainly within the court's discretion to avoid. As the Chief Justice points out, it not only might "pledge" the jury to a verdict to the unfair detriment of the defendant, but in situations where the juror bias is less evident than in this case, it might well create an appearance of bias against a high dollar verdict that is only a reaction to a high dollar figure that is heard prior to the introduction of any evidence or instruction on the law.

RILEY, C.J. I respectfully dissent. While I agree with the four-part test adopted by the majority, I disagree with the majority's application of the test in the instant case. Rather, I would hold that under the first prong, the trial court did not abuse its discretion in refusing to excuse juror Primo for cause. Therefore, I would reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

The majority correctly recognizes that the ulti-

mate decision whether to grant or deny a party's challenge on voir dire falls within the trial court's discretion. Consequently, we must determine whether the trial court abused its discretion in refusing to grant plaintiffs' challenge for cause. As such, the trial court's action must oppose any exercise of reason and be " 'so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will.' " *Ante,* p 252; *Spalding v Spalding,* 355 Mich 382, 385; 94 NW2d 810 (1959).

As applied in the instant case, the majority concludes that the trial court abused its discretion in refusing to excuse juror Primo for cause upon the basis of the following reasoning: "the totality of Primo's profession as a registered nurse, her special skill in reviewing quality-of-care issues in neonatal intensive care cases, her close working relationship with the wife of the hospital vice-president, her acquaintance with the vice-president himself, a witness in this case, *and her conceded 'fairly' 'strong personal feelings about' damages, render the risk of uncompromising bias clear." Ante,* pp 253-254 (emphasis added). It is only by combining juror Primo's statement regarding damages with the first four factors that the majority can reach the conclusion that the trial court abused its discretion in refusing to grant plaintiffs' challenge for cause.[1] However, plaintiffs never raised these factors as a basis for dismissing juror Primo for cause.[2] Rather, plaintiffs relied

---

[1] Conversely, the Court of Appeals reversed the decision of the trial court solely upon the basis of juror Primo's statements regarding damages. However, the Court of Appeals ignored any standard of appellate review and merely substituted its judgment for that of the trial court.

[2] The trial court inquired into these areas and found juror Primo's answers satisfactory. Plaintiffs never questioned juror Primo further and never raised these issues on appeal.

entirely upon Primo's statements pertaining to damages as the basis for the trial court's failure to dismiss juror Primo for cause. In my opinion, the majority errs in considering these other factors.

More importantly, even assuming that the majority only relied upon juror Primo's statements regarding the size of a potential damages recovery, I disagree that the trial court abused its discretion in refusing to grant plaintiffs' challenge for cause. The trial court began voir dire examination with a few introductory statements and questions concerning the instant case, a medical malpractice action. Before the introduction of any evidence, plaintiffs' attorney asked the question:

> The Plaintiffs intend to offer evidence which will indicate that young Matthew is a quadrapalegic [sic] child who is blind, suffers from cerebral palsy, and is essentially unable to do anything for himself; that he is going to require twenty-four-hour care for the rest of his life, and that he will be unable to be gainfully employed for the rest of his life, hence the Plaintiffs will further claim that therefore Matthew and his parents, Jeffrey and Barbara, have suffered very, very extensive damages. We intend to establish and offer evidence that would indicate that damages by all the parties are in the approximate amount of in excess of eight million dollars. It's a very, very large figure, one that is—could be shocking to hear. Would any of you, if you find that the Plaintiffs have, in fact, by the burden of proof that's required of us, established negligence, proximate cause and damages in such an extensive amount—if you are able to find that, that we've met our burden, would there be any of you who would not be able to award such damages just because of the nature that they are in such a large amount?

The majority believes that juror Primo's responses to this and similar questions warrant reversal

of the decision of the trial court. However, in my opinion, juror Primo's statements did not constitute error requiring reversal when considered in their proper context. As one United States District Court summarized:

> A review of the applicable authorities discloses that the trial court may, in the exercise of its discretion, permit juror interrogation designed to identify pre-existing bias or prejudice against large damage awards which may not readily yield to the evidence presented. . . . It is imperative, however, that any such inquiry be framed in a general and entirely nonsuggestive manner, so as to eliminate any possibility that the question will serve to commit or pledge any member of the jury panel to a specific verdict amount. [*City of Cleveland v Cleveland Electric Co*, 538 F Supp 1240, 1250 (ND Ohio, 1980). Citations omitted.]

The instant case presents a perfect example of this; plaintiffs' inquiry is improperly suggestive and inflammatory. On the one hand, plaintiffs, through their attorney, state that the amount "is —could be shocking to hear," and on the other hand, want to dismiss for cause someone like juror Primo who agrees. Not only does this seem rather anomalous, but it illustrates that the underlying error in the instant case may not be in juror Primo's responses to plaintiffs' questions but, rather, in the overly suggestive nature of plaintiffs' questions. The voir dire transcript indicates juror Primo's genuine concern was over returning an $8 million verdict without hearing any evidence. Even the trial court recognized juror Primo's difficulty in comprehending the tenor of plaintiffs' question and appropriately conducted further questioning to help clarify the situation. In response, juror Primo unequivocally stated her

willingness and ability to base her decision upon the evidence, but she steadfastly refused to commit herself to return a verdict for any specific amount. Although plaintiffs may not have liked juror Primo's answer, that, in and of itself, does not mandate dismissing her for cause.

The purpose of challenges for cause are to impanel an impartial jury. However, questions which require potential jurors to "pledge" their willingness to return a verdict for a specific and exorbitant sum of money does not aid in impaneling an impartial jury because neither party has produced any evidence. If plaintiffs only wanted to ferret out potential jurors that might not return a large verdict if plaintiffs proved all the essential elements of their case, then they did not have to list the severity and intricacies of Matthew Poet's injuries and the specific amount they thought he should recover. They only had to ask whether any juror had trouble returning a "very large or multimillion dollar jury verdict which would appropriately compensate plaintiffs for their injuries."

In *Bunda v Hardwick,* 376 Mich 640; 138 NW2d 305 (1965), this Court addressed this issue in dicta; specifically whether plaintiff's counsel may inquire into the exact size of a potential jury verdict during voir dire examination. In *Bunda,* the Court approved the plaintiff's asking potential jurors whether they could return a verdict for $300,000, the amount requested in plaintiff's complaint. However, several factors persuade me that such questions no longer help the parties in selecting an impartial jury.

First and foremost, when the *Bunda* Court addressed the issue, GCR 1963, 111.1(3) required a plaintiff to plead the specific amount of damages requested as relief in any particular cause of action. Thus, it made some sense to permit a

plaintiff on voir dire examination to inquire into whether a potential juror would not return a verdict for a specific amount, *the sum the plaintiff requested in the complaint.* In fact, the *Bunda* Court authorized only this narrow scope of voir dire inquiry:

> Such an argument begs the question, in that it assumes that counsel will be permitted to question jurors in such a manner as to exact an express or implied pledge on their part. Of course, counsel can, and should, be barred from doing so. It would not, however, be an abuse of judicial discretion to permit counsel *to question jurors to determine* whether they would be willing to return a verdict for plaintiff *in the amount requested* if they find upon all evidence adduced at trial that he is entitled to such amount. [*Id.* at 663. Emphasis added.]

However, since then, this Court adopted MCR 2.111(B)(2), which superseded GCR 1963, 111.1(3) and now prohibits a plaintiff seeking damages over $10,000 from requesting relief for a specific amount. That issue must be left for the jury after they evaluate all of the evidence at trial. Consequently, plaintiff should not be permitted to ask potential jurors whether they would return a specific verdict over $10,000 just because plaintiff deems that figure appropriate. That question does not affect a potential juror's ability to return a verdict in the amount requested.

In the instant case, the controversy arose because juror Primo stated that she could base her decision upon the evidence presented, but she steadfastly refused to commit herself into returning a verdict of $8 million without hearing any evidence. Juror Primo's hesitancy in pledging her-

self to return a verdict of $8 million without hearing any evidence should not be condemned.[3]

---

[3] The trial court reached the same conclusion with almost identical reasoning at the motion for a new trial:

*The Court:* The challenge as to Juror Primo was made under MCR 2.511(D)(4) and (5). The juror's response to matters with respect to amount of damage need be examined in terms of the entire context of the jury voir dire. In that regard it is the Court's observation that one of the tactical decisions that Counsel will make in the course of a personal-injury action of this type is that it is an effective bit of advocacy to condition the Jury to the nature of damage request that will be made, recognizing that the Jury may not have anticipated the magnitude of what the proofs might support or disclose. It is, however, quite reasonable to suggest that it may present prospective jurors with some difficulty, before they've heard any of them, to commit themselves to a suggestion that they would, without reluctance give consideration to figures in the range of multi-million dollars.

In this instance in the course of Counsel's voir dire, at page twenty-two of the transcript it was disclosed to prospective jurors that there was an intent to offer evidence indicating damages in the range of eight million dollars, acknowledging that this could be a shockingly-large figure. This was an inquiry addressed to the panel before Juror Primo was seated or Juror Bennett, but they were present and a part of the jury array and did hear the inquiries. At page twenty-three Plaintiffs' Counsel continues that it's necessary that the jurors be able to consider and live with possible damages that will fairly compensate, whether it is one dollar, zero dollars, or ten million dollars. Likewise, Defense Counsel responded then—page twenty-seven—asking the Jury panel if they would be capable, in a finding of no liability or fault, no negligence or fault, of returning a verdict of no recovery, notwithstanding the substantial damages that might be heard.

This context is important, because the first response of Juror Primo suggests she was concerned about the specific figure of eight million dollars. She first, in response to the Court's general questions at page forty-eight, indicates that she might have responded somewhat differently than other persons seated around her because of different feelings about the elements of compensation. On page forty-nine she makes it clear that this would not affect her judgment of fault, but simply the amount of damage, and, again on page forty-nine, her misunderstanding and need for some explanation of what the responsibility of jurors would be is clear, indicating that if this means that the judgment was guilty, then it's automatically eight million dollars, and she raises the question, "Or is it possible for someone to be guilty and the amount be lesser." She required and the Court attempted to explain the fact that the amount of

Accordingly, the trial court did not abuse its discretion in refusing to dismiss juror Primo for cause in the instant case. I would reverse the

damages, as well as cause and negligence issues, would be left to the Jury. She then responded, after that explanation, at page fifty that knowing those possibilities, that she did not feel that she had preconceived notions that would interfere with fairly assessing and judging the issues to be presented. Then, as indicated by Counsel, when Plaintiffs' Counsel initiated questioning of this prospective juror, she did, at page fifty-two, fairly strong personal feelings that there should be some ceiling to damage. The question was raised to her then in terms of "would it be difficult then for you to come back with an extensive award for those elements of damage?" Her answer was, "I think I would have to be presented with everything first, to really say that for sure. I might have a problem," and in response on page fifty-three to Mr. Hayes' question, it's true that she might not have a problem. When the Court, at pages fifty-five and fifty-six, asked further questions of the juror, she again was equivocal in saying she would have problems with specific figures like eight million dollars. She correctly at this point indicated that it would not be her sole decision, and the last question on that page, page fifty-six, we explored the difficulty and she said it was not a difficulty with her having a preconceived limitation or absolute amount; it was the size of the figure that was bothering her.

I would conclude, in that context and reviewing what the prospective juror had to say, that it is not clearly a matter which falls within the areas delineated by MCR 2.511(D)(4) and (5). To the contrary, she had indicated a hesitation, a problem in dealing with high figures, but not an absolute limitation. Her difficulty, to me, was indicative that she properly recognized this was a serious undertaking, not a simple one, not one easily resolved. As she repeatedly said, "I would have to hear the evidence, hear it all," clearly is an appropriate position. She should not commit herself to any figure in advance of hearing the evidence. I can empathize with the juror who comes without knowledge of our proceedings and not having a precise grasp of what would be the task at the end of the trial in deliberation, but it appears to the Court in this circumstance that we have a juror who has shown the proper type of reluctance to make quick judgments, to recognize the seriousness of the task she is about to undertake.

There not being a clear indication of an inappropriate state of mind or of a fixed opinion which would improperly influence the verdict, I would not conclude this to be within the sub-rules cited, but a matter within the discretion of the Court, as was set forth in *Brownell* [*v Brown*, 114 Mich App 760; 319 NW2d 664 (1981)].

decision of the Court of Appeals and reinstate that of the trial court.

GRIFFIN, J., concurred with RILEY, C.J.

BOYLE, J., concurred only in the result reached by RILEY, C.J.