*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JERMEY GOOD,

        Plaintiff-Appellant,

v

PIONEER STATE MUTUAL INSURANCE
COMPANY,

        Defendant-Appellee.

UNPUBLISHED
May 21, 2020

No. 345564
Oakland Circuit Court
LC No. 2016-155301-NF

Before: MURRAY, C.J., and RONAYNE KRAUSE and TUKEL, JJ.

PER CURIAM.

In this no-fault insurance dispute over attendant-care benefits, plaintiff appeals as of right the trial court's judgment of no cause of action, following a jury trial, in favor of defendant. We affirm. This appeal is being decided without oral argument under MCR 7.214(E)(1).

## I. FACTUAL BACKGROUND

The parties went to trial over their dispute concerning the appropriate valuation of attendant-care services that plaintiff's wife, Cassandra Good, provided to plaintiff after he was paralyzed in a car accident, becoming a quadriplegic. The parties disagree regarding the hourly rate to which plaintiff's wife is entitled for her attendant-care services, specifically, whether it should be the rate of a professional nurse (such as a registered nurse (RN) or a licensed practical nurse (LPN)), the lower rate of a "high-tech aide," or a "blend" of those rates calculated by the ratio of time that she customarily spends on varying attendant-care duties.

The case eventually proceeded to a jury trial, with plaintiff contending that defendant was refusing to compensate his wife for the fair-market value of her services. At trial, the parties offered the testimony of two competing expert witnesses, both of whom are RNs. Plaintiff's expert opined that all of plaintiff's wife's time should be compensated at a rate of $60 an hour, i.e., at a rate appropriate for an RN, and defendant's expert opined that the blended rate it had adopted in February 2017 was appropriate.

-1-

After it was instructed, the jury was charged with completing a special-verdict form. It did so, unanimously finding that plaintiff was entitled to no allowable expenses related to his wife's attendant-care services that defendant had not already paid. Accordingly, the trial court entered a judgment of no cause of action against plaintiff. Plaintiff filed a motion for a new trial, which the court denied.

## II. CHALLENGE FOR CAUSE

Plaintiff's first claim of error regards the trial court's denial of his motion to excuse Juror #166 for cause under MCR 2.511(D). Jury selection spanned the first two days of trial. On the first day, the trial court asked the venire the following question:

> In this case, a spouse taking care of her quadriplegic husband, and the Plaintiffs are asking for reasonable—the reasonable value of her services, because the injuries he suffered in the accident, can any members of this panel tell us about any concerns that you might have about a family member asking to be compensated for taking care of another family member?

Two of the prospective jurors—Jurors #115 and #166—raised their hands in response. Relevant here, when called on to give her reasons, Juror #166 initially explained: "I would never ask for compensation to take care of family." The trial court then asked: "But would you have a problem if someone else has a different view, and if they were going to take care of a family member and said okay, but I want to be compensated for it?" Juror #166 replied: "I wouldn't have a problem; that would be, you know, their choice," explaining that she would not "personally" ask for such compensation. Later, when the members of the venire were asked whether, if they "actually had insurance to cover for a family member providing care," they would "use it," Juror #166 answered: "If I was lacking the finance on my own, maybe."

When asked what she thought about Michigan's no-fault insurance system in general, Juror #166 replied: "I find it very complicated to understand, and I never get the answers—when you call your insurance company asking questions, I feel like they just—just, you know, beat around the bush and you never get an answer."

One of plaintiff's trial attorneys later questioned Juror #166 in the following exchange:

> [*Plaintiff's Counsel*]:
>
>         \*    \*    \*
>
> One of the central issues, . . . as we've learned is we have . . . a wife who's taking care of the husband, and the husband, as you know, is a high level quadriplegic, a potentially daunting task. She is asking to be compensated as an insurance benefit through an insurance policy, and you had stated well—I mean one of the things that you had said was I wouldn't ask for it, and that's okay. I'm interested; why wouldn't you ask for it?

-2-

*JUROR NUMBER 166*: I can't put a price on love. I feel—I mean it might be too extreme; I—I understand if my financial situation was—that I needed the money, but I think I would go with family first before I went after a company.

[*Plaintiff's Counsel*]: Okay. When you say you can't put a price on love, and you look like you're concerned about even saying it, it's okay, it's—it's perfectly understandable; I don't know that anybody can.

But . . . this is what I'm getting at; so at some point, you won't meet [plaintiff], . . . you'll see some video of him, but you will meet his wife, . . . and you are going to be deciding this case potentially. I—I—are you—what—as you look at her, you say geez, she's—she's asking to do something I wouldn't do; is that—

*JUROR NUMBER 166*: I respect what she's doing, but at the same time, I don't know how I—I'd have to be put there to—you know, but *I can feel a bias in my head already*.

[*Plaintiff's Counsel*]: Yeah, and—and that's what I'm getting at, and you're—you're tensing up a little bit—

*JUROR NUMBER 166*: I don't want to offend anybody, but that's the thing—

[*Plaintiff's Counsel*]: That's just—here's—here's the beauty of what we're doing right now. You can't offend anybody. You really can't. That's part of being brutally honest about—

*JUROR NUMBER 166*: It's just me.

[*Plaintiff's Counsel*]: That's right.

*JUROR NUMBER 166*: It's just me.

\* \* \*

[*Plaintiff's Counsel*]: . . . . [Y]ou've used the word bias, and . . . it's a fine word. It's not a negative word. It just means that you have—you have things that you might not be able to set aside. It's just too strong to do. Is—is that what you're feeling right now?

*JUROR NUMBER 166*: A little bit, but I—I—I'm good at putting myself in other people's shoes.

[*Plaintiff's Counsel*]: Okay.

*JUROR NUMBER 166*: So I could—I could set that aside and try to look, but as I said, there's no guarantee. I'd have to be in that situation at that time.

[*Plaintiff's Counsel*]:  There's no guarantee?

*JUROR NUMBER 166*:  Right.

[*Plaintiff's Counsel*]:  Do you have concerns about—about these things that we're talking about right now?

*JUROR NUMBER 166*:  Yes.

[*Plaintiff's Counsel*]:  Okay.

*JUROR NUMBER 166*:  I have a lot of questions in my head, but I mean I guess they'll be answered as the case—

\* \* \*

[*Plaintiff's Counsel*]:  I'm going to give an example; . . . we hear the word prejudice and bias, and we think oh, this is all [sic] bad things, and they're not necessarily; they're just—we all have life experiences.  I don't like cherries. I cannot stand cherries, okay?  And if somebody said to me . . . , we want you to be a judge in this pie contest, and there was cherry pie, there was chocolate pie, there were a bunch of other things.  I would say I'm not the right person to judge those facts, I don't like cherries; it is unlikely—it could be the best pie in the world, and I—I'd consider all of the facts that went into making that pie, everything says it's the best, it's the greatest, and I'm still going to say I like the chocolate, because I'm never going for the cherry pie.

This is . . . really what I'm after . . . when we're talking about . . . these concerns that you have . . . that someone's going to be saying . . . I would like to be compensated for this care.  You have concerns.  Are . . . you like that person who doesn't like cherry pie judging that right now; is that your concern, that you can't—

*JUROR NUMBER 166*:  If I have to answer right now—

[*Plaintiff's Counsel*]:  Yeah.

*JUROR NUMBER 166*:  —I would have to say yes.

[*Plaintiff's Counsel*]:  Okay.  And what I take from that is . . . you, it sounds like . . . have concerns that you would be biased and you really couldn't judge it fairly; is that fair to say?

*JUROR NUMBER 166*:  Well, I don't know all the details of the case—

[*Plaintiff's Counsel*]:  Okay.

*JUROR NUMBER 166*:  —but knowing what I know right now, yes.

-4-

[*Plaintiff's Counsel*]:  Okay.

*JUROR NUMBER 166*:  I would have a hard time.

[*Plaintiff's Counsel*]:  Okay.

*JUROR NUMBER 166*:  I would not want to be put in that situation.

[*Plaintiff's Counsel*]:  Okay.  And what we—what we cannot do, because of our limitations, we don't try the case before you and say how would you do—

*JUROR NUMBER 166*:  Right.

[*Plaintiff's Counsel*]: . . . . [T]hat's not how we select.  This is all that we can go on . . . .

*JUROR NUMBER 166*:  Yeah.

\* \* \*

[*Plaintiff's Counsel*]:  . . . . *[Y]ou don't think you can be fair in this case*?

*JUROR NUMBER 166*:  *I can't.*

[*Plaintiff's Counsel*]:  Okay.

[*Defense Counsel*]:  I'm sorry; I didn't hear.

*JUROR NUMBER 166*:  I cannot.

Plaintiff's counsel subsequently questioned Juror #115 about his similar concerns and his stated bias with regard to plaintiff's wife, who was an uncertified layperson, requesting attendant-care compensation at the rate of a certified professional, such as an RN.  Plaintiff's counsel questioned Juror #119 about concerns similar to those expressed by Jurors #166 and #115, with Juror #119 expressing additional concerns about "a housewife" requesting compensation at the rate of a licensed professional.

On the second day of trial, voir dire continued with defense counsel questioning Jurors #115 and #119 about their comments the prior day, asking both whether they could "set aside the opinion that [they] rendered about [their] own personal feelings . . . yesterday," and follow the trial court's instructions concerning the law.  Both replied in the affirmative.  Defense counsel continued by questioning Juror #166 as follows:

[*Defense Counsel*]:  Okay.  Now juror number two, you had some of the same ideas, or some of the same answers to [plaintiff's counsel's] questions yesterday, only you qualified them, at least each time I heard, to say well, I wouldn't do it, but it's okay if other people do it; did I accurately—

*JUROR NUMBER 166*:  Yes.

[*Defense Counsel*]:  —paraphrase what you said?

*JUROR NUMBER 166*:  Yes.

[*Defense Counsel*]:  Okay.  You understand that the Plaintiff in this case has chosen the option of getting compensated; you understand that's why we're here?

*JUROR NUMBER 166*:  Yes.

[*Defense Counsel*]:  All right.  You're good with that?

*JUROR NUMBER 166*:  Yes.

[*Defense Counsel*]:  It may not be the road you choose to travel, but you find no fault with the Plaintiff choosing to travel that road; is that fair?

*JUROR NUMBER 166*:  Fair.

[*Defense Counsel*]:  Okay.  Can you, like [Jurors #115 and #119], set aside the personal feelings you have, that you wouldn't personally do it, and judge this case fairly, knowing that the law is that the Plaintiff in this case is allowed to do that?

*JUROR NUMBER 166*:  Of course.

\* \* \*

[*Defense Counsel*]:  All right.

The bottom line is this, regardless of your personal opinions, . . . can you judge this case fairly based upon the facts and the law as presented to you, setting aside whatever personal feelings and personal opinions you have as we sit here right now?

\* \* \*

Can you do that?  We—we heard a lot about your opinions yesterday, but I—this is a very specific question that goes right to the heart of your qualifications. We all come in with personal experience, we all come in with our own personal— I—I think [plaintiff's counsel's] word was biases, and they aren't necessarily bad. They might be bad if they affect the case.  So my question to you . . . is very specific. Can you take those biases, whatever they might be, put them in a bag, and leave them by the door to the courtroom when you come in, so that those biases will have no effect whatsoever on you fairly judging the evidence in this case, and applying it to the law as told to you by [the trial judge]; can you do that?

-6-

*JUROR NUMBER 166*: Yes.

Almost immediately thereafter, the trial court inquired whether plaintiff wished to make any challenges for cause. Following a bench conference, plaintiff's counsel indicated that he wished to challenge Juror #166 "for cause on the basis of her statements" "that she did not believe that she . . . could be a fair and impartial juror for this particular case." After briefly entertaining oral argument, the trial court denied plaintiff's challenge for cause with respect to Juror #166.

"[F]or the same reasons" plaintiff's counsel had stated with regard to Juror #166, he also moved to excuse Juror #115 for cause. The trial court granted that motion, reasoning, in relevant part, as follows:

> Okay. I have a different take on this juror [Juror #115], so I'm going to engage the juror.
>
> Unlike [Juror #166], the extensive questioning that went with you last evening, your repeated answers were that you would be biased, because you didn't believe that you could fairly listen to the case, and set those biases aside. Now, counsel for defense asked you the question and your response was other than what you gave last evening, even though extensively last evening, your position was most firm.
>
> I'm going to grant the motion to—on cause for this juror, because I too, as I listened to your responses and the firmness of them, I was convinced that you would not be appropriate to sit on this jury.

During the remainder of jury selection, plaintiff did not move to excuse any other jurors for cause.

Plaintiff subsequently exercised all three of his peremptory challenges,[1] thereby excusing Jurors #119, #16, and #165 without any comment regarding why plaintiff found them objectionable. Plaintiff made no request for additional peremptory challenges after exhausting his allotted three.

On appeal, plaintiff argues that the trial court abused its discretion by denying his motion to excuse Juror #166 for cause under MCR 2.511(D). Plaintiff further argues that the trial court's abuse of discretion in that regard qualifies as error requiring reversal under the test set forth in *Poet v Traverse City Osteopathic Hosp*, 433 Mich 228; 445 NW2d 115 (1989). Assuming, without deciding, that the trial court abused its discretion by refusing to excuse Juror #166 for cause, we conclude that plaintiff is nevertheless not entitled to relief because he cannot demonstrate "actionable prejudice" requiring reversal under *Poet*.

"This Court reviews a court's decision to deny a challenge for cause for an abuse of discretion." *Jalaba v Borovoy*, 206 Mich App 17, 23; 520 NW2d 349 (1994). In *Poet*, 433 Mich

---

[1] See MCR 2.511(E)(2) ("Each party may peremptorily challenge three jurors.").

at 251-253 & n 21, although our Supreme Court recognized that "the continued applicability" of the *Spalding*[2] formulation of the abuse of discretion standard had been "questioned," the Court declined to concoct a new one, instead relying on *Spalding*. See *Brown v Brown*, 181 Mich App 61, 71-72; 448 NW2d 745 (1989) ("Our Supreme Court . . . recently reaffirmed the *Spalding* standard for what constitutes an abuse of discretion in *Poet*[.]"). About 16 years after *Poet* was decided, however, our Supreme Court adopted the standard set forth in *People v Babcock*, 469 Mich 247; 666 NW2d 231 (2003), as the "default abuse of discretion standard" in lieu of the *Spalding* standard. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). In light of *Maldonado*, we apply the *Babcock* formulation here, under which "[a] trial court abuses its discretion when it chooses an outcome falling outside the range of reasonable and principled outcomes, or when it makes an error of law." *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 263; 833 NW2d 331 (2013) (footnotes and citations omitted). See, e.g., *In re Elias*, 294 Mich App 507, 539; 811 NW2d 541 (2011) (relying on *Maldonado* to adopt the *Babcock* standard in the context of review of parole-board decisions).

Under *Poet*, "[t]he determination whether a trial court improperly denied a challenge for cause is made in accordance with whether a juror is excusable under MCR 2.511(D)." *Jalaba*, 206 Mich App at 24. We review de novo a trial court's interpretation and application of court rules. *Pellegrino v AMPCO Sys Parking*, 486 Mich 330, 338; 785 NW2d 45 (2010). The trial court's related factual findings are reviewed for clear error, *Bynum v ESAB Group, Inc*, 467 Mich 280, 283; 651 NW2d 383 (2002), which exists when this Court is "left with a definite and firm conviction that a mistake has been made," *Ford Motor Co v Dep't of Treasury*, 313 Mich App 572, 588; 884 NW2d 587 (2015). "In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

"Prospective jurors are subject to challenge for cause under MCR 2.511(D)." *Bynum*, 467 Mich at 283. "Jurors are presumed to be qualified. The burden of proving the existence of a disqualification is on the party alleging it." *Id*. See also *People v Miller*, 482 Mich 540, 550; 759 NW2d 850 (2008) (quotation marks and citation omitted; ellipsis in original) ("jurors are presumed to be . . . impartial, until the contrary is shown.").

In *Poet*, 433 Mich at 240, our Supreme Court established a legal test that could be used "to *uniformly* determine when a trial court's error in overruling a challenge for cause requires reversal[.]" (emphasis supplied). Such an inquiry, the Court reasoned, must "focus on the causal relationship between an erroneous denial, its effect upon the availability of allotted peremptory challenges, and how each of these factors influenced the ultimate composition of the jury in question." *Id*. at 240-241. In part, this is because it is difficult, after the jury has rendered a verdict, to clearly gauge the prejudicial effect that an unexcused juror's presence might have had during

---

[2] *Spalding v Spalding*, 355 Mich 382; 94 NW2d 810 (1959), rejected in part by *Maldonado v Ford Motor Co*, 476 Mich 372, 388 (2006) ("we prefer the articulation of the abuse of discretion standard in [*People v Babcock*, 469 Mich 247; 666 NW2d 231 (2003)] to the *Spalding* test and, thus, adopt it as the default abuse of discretion standard.").

deliberations. See *id*. at 252 ("Despite the fact that the jury's verdict in this case was six to zero, there is, of course, no way for this Court or the lower courts to know how juror Bennett's general presence, personal knowledge, or expertise in the area explored at this trial, affected the other jurors during their deliberations."); see also *id*. at 252 n 19 (quotation marks and citation omitted) ("The juror which remained because the plaintiffs had no challenge to remove him may have been a hawk amid seven doves and imposed his will upon them."). Because of this, under certain circumstances, "a degree of prejudice can be presumed" from an improper denial of a motion to excuse a juror for cause. *Id*. at 240.

But *presumed* prejudice, standing alone, does not warrant relief under *Poet*. *Id*. at 240-241. Rather, there must be "an independent and objective manifestation of *actionable* prejudice," by way of a

> clear and independent showing on the record that: (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges,[3] (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable. [*Id*. at 241 (footnotes omitted; emphasis added).]

Although it is a close question whether plaintiff has demonstrated that the trial court abused its discretion with regard to Juror #166, we will assume it did so.[4] But even when doing so, plaintiff is still not entitled to relief because he cannot satisfy the third and fourth elements of the *Poet* test.

---

[3] Temporally speaking, the moving party need not have *already* exhausted his peremptory challenges; it suffices if they are exhausted before the end of jury selection. See *Poet*, 433 Mich at 255 n 25 (granting the moving party a new trial despite the fact that her peremptory challenges were exhausted *after* the trial court's disputed ruling, not directly as a result of it).

[4] On the one hand, the trial court's decision clearly rested on credibility determinations it formed after personally observing Juror #166's responses to questions during voir dire. This is underscored by the fact that the trial court *did* excuse Juror #115 for cause, reasoning that while the court had credited Juror #166's statements that she would be able to set aside any preexisting bias and decide this case fairly based on the instructions she was given, the court was not convinced by Juror #115's similar statements. We generally defer to these credibility assessments. *Andrusz v Andrusz*, 320 Mich App 445, 455; 904 NW2d 636 (2017).

On the other hand, when considering a challenge for cause with regard to a prospective juror who has "affirmatively articulate[d] a particularly biased opinion which may have a direct effect upon [his or her] ability to render an unaffected decision," "a trial judge should . . . err on the side of the moving party." *Poet*, 433 Mich at 238. Indeed, "if reasonable apprehension may be *alleviated from the mind* of the movant, and a nonmovant's rights will not be prejudiced, a challenge for cause should be granted." *Id*. (emphasis added). "There are simply too many unbiased and otherwise qualified individuals eligible to sit on any given jury to quibble over persons who have voluntarily articulated a grave potential for bias." *Id*. at 238-329.

With regard to the third element—i.e., the moving party demonstrated the desire to excuse another subsequently summoned juror—the moving party is required to manifest such desire by way of "a motion to challenge for cause, a request for additional peremptory challenges in the case of exhaustion, or a simple expression of dissatisfaction with a juror who cannot be excused because of improperly compelled exhaustion." *Id*. at 255 n 26; accord *Colbert v Primary Care Med, PC*, 226 Mich App 99, 102; 574 NW2d 36 (1997). In this instance, after the trial court denied plaintiff's motion to excuse Juror #166, plaintiff *did* move to excuse another juror for cause. But the trial court *granted* that motion, excusing the objected-to juror, which plainly resulted in no actionable prejudice to plaintiff. See *Poet*, 433 Mich at 240-241 (noting that this prejudice inquiry "focus[es] on the causal relationship between an erroneous denial, its effect upon the availability of allotted peremptory challenges, and how each of these factors influenced the ultimate composition of the jury in question."). Nor did plaintiff challenge any other jurors for cause, request additional peremptory challenges, or express dissatisfaction with any juror who could not be excused because plaintiff lacked any further peremptory challenges. Thus, the third element of the *Poet* test was not met.

Nor did plaintiff satisfy the fourth element, i.e., the juror whom the party later wished to excuse was objectionable. "In order for a party to establish that a potential juror is objectionable, there must, first, be a specific indication, on the record, that the party seeking removal finds the individual objectionable. Second, *the objector must expressly articulate or list the particular reasons why the juror is objectionable*." *Id*. at 241 n 15 (emphasis added). After the trial court denied plaintiff's motion to excuse Juror #166, he articulated no specific objections to any juror other than the one he successfully challenged for cause. Again, that successful challenge is not properly considered as proof of prejudice under *Poet* because it did not alter the jury's composition in a manner that was adverse to plaintiff. See *id*. at 240-241. And although plaintiff subsequently used his peremptory challenges on several jurors, he articulated no particular reasons for doing so. In sum, because plaintiff did not expressly articulate any objections to a subsequently summoned juror who ended up on the final panel, he did not satisfy the fourth element of the *Poet* test. See *Colbert*, 226 Mich App at 102.

III. JURY "NULLIFICATION"

Toward the end of his brief plaintiff argues that the jury's verdict must be set aside because it was the result of "jury nullification." Notably, plaintiff does not contend that the jury's verdict was against the great weight of the evidence, which is the usual mechanism for challenging such a verdict. See *Precopio v City of Detroit Dep't of Transp*, 415 Mich 457, 466 n 13; 330 NW2d 802 (1982), and *Tuttle v Dep't of State Hwys*, 397 Mich 44, 46 n 3; 243 NW2d 244 (1976). Nor does plaintiff argue that the jury's special verdicts "are so logically and legally inconsistent that they cannot be reconciled" and must, therefore, be set aside. See, e.g., *Local Emergency Fin Assistance Loan Bd v Blackwell*, 299 Mich App 727, 738; 832 NW2d 401 (2013) (quotation marks and citation omitted). Consequently, we reject this claim of error.

Affirmed.

/s/ Christopher M. Murray
/s/ Jonathan Tukel