*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

THOMAS ADAM HULBERT,

        Defendant-Appellant.

UNPUBLISHED
March 18, 2021

No. 350268
Muskegon Circuit Court
LC No. 18-006239-FH

Before: GLEICHER, P.J., and K. F. KELLY and RIORDAN, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

This domestic violence case was a credibility contest. The complaining witness testified that her ex-husband, defendant Thomas Hulbert, repeatedly punched her in the face and broke her nose. Hulbert insisted that the complainant lunged at him while they were seated in her vehicle, and that he sustained a defensive wound on his arm inflicted by her fingernails. The couple had a history of domestic violence. Several years earlier, the complainant had been criminally charged after attempting to run over Hulbert with her car. The prosecutor decided against pursuing that case.

The jury found Hulbert guilty of domestic violence. His appeal raises several claims of ineffective assistance of counsel. He additionally alleges that he was unconstitutionally shackled during the trial. I would remand for an evidentiary hearing regarding both issues.

## I. THE SHACKLING

The majority dispenses with Hulbert's shackling claim by finding the record "unclear" as to whether Hulbert was actually shackled "during the trial or whether the jury ever saw [Hulbert] in restraints[.]" The majority errs by failing to order a remand regarding Hulbert's possible shackling.

At the outset of the trial, the following colloquy ensued:

-1-

*The Court*:  Okay.  We're on the record in People - -

*The Clerk-Bailiff*:  Please be seated.

*The Court*:  - - versus *Hulbert*.  Okay.  I see we have a problem already.  Defendant is in - -

*Mr. Hendrickson* [defense counsel]:  Your Honor, can we have the - -

*The Court*:  That's up to the - - that's up to the deputies, but - -

*Mr. Hendrickson*:  Sir, can we have the chains taken off?

*The Court*:  He's in - - he's in jail garb.  Does - -

*Mr. Hendrickson*:  Your Honor, that's - - that's what we have, I think.  And we've - - we've talked about it and that's what he's been in the last six months and that's what he's going to do.  If it's all right with the Court.  If it's not all right with the Court, I understand.

*The Court*:  No, no.  But you'd rather have him dressed like that than street clothes?

*Mr. Hendrickson*:  Yes, Your Honor.

*The Court*:  Okay.  If that's what you want to do, that's fine.  It's no problem.

*Mr. Hendrickson*:  But with the chains, though, if that's - -

*The Court*:  Yeah.  *Well, that's up to the sheriffs*.

*The Defendant*:  I'm not going anywhere.

*The Court*:  Okay.  So what are we putting on the record then besides that? . . .  [Emphasis added.]

No additional information of record indicates whether Hulbert remained shackled, or whether the jury saw the shackles.

Due process principles prohibit the routine shackling of criminal defendants.  "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."  *Deck v Missouri*, 544 US 622, 629; 125 S Ct 2007; 161 L Ed 2d 953 (2005).  More than a decade before the United States Supreme Court decided *Deck*, the Michigan Supreme Court declared, "The rule is well-established in this and other jurisdictions that a defendant may be shackled only on a finding supported by record evidence that this is necessary

to prevent escape, injury to persons in the courtroom or to maintain order." *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994).[1]

No record findings justified shackling Hulbert. Indisputably, the trial court erred by expressing that whether Hulbert would remain shackled was "up to the sheriffs"; this decision lay solely with the court—the use of visible restraints is prohibited "*absent a trial court determination, in the exercise of its discretion,* that they are justified by a state interest specific to a particular trial." *Deck*, 544 US at 629 (emphasis added). Shackling is " 'inherently prejudicial.' " *Id* at 635, quoting *Holbrook v Flynn*, 475 US 560, 568; 106 S Ct 1340; 89 L Ed 2d 525 (1986). Because there is no record justification for it, if Hulbert remained shackled during the trial, the shackling was patently unconstitutional.

In an analogous case ignored by the majority, our Supreme Court ordered an evidentiary hearing to determine whether the jury saw the defendant's shackles, and further instructed that if the jury saw the shackles, "the circuit court shall determine whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant." *People v Davenport*, 488 Mich 1054; 794 NW2d 616 (2011). The same procedure should be ordered here, along with an additional, preliminary inquiry focused on whether Hulbert was actually shackled during the trial.

Hulbert's counsel objected to Hulbert's shackling. Whether the objection resulted in removal of the shackles is unknown. The only way to answer this critical question is to remand for an evidentiary hearing. In my view, a remand is constitutionally imperative.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Hulbert's ineffective assistance of counsel claims focus on three trial events: voir dire, the introduction of a lengthy body cam video, and closing argument. The majority holds that Hulbert's counsel ineffectively stipulated to the introduction of a police officer's body cam video but finds no prejudice. Counsel also performed ineffectively during voir dire, and potentially performed ineffectively by failing to give a closing argument. A *Ginther*[2] hearing is warranted to determine whether counsel had a reasonable strategic basis for admitting the entire video and by failing to

---

[1] The majority suggests that because Hulbert wore his "jail blues," any shackling was irrelevant. The majority misunderstands the reasons that routine shackling is constitutionally prohibited. As the United States Supreme Court explained in *Deck*, 544 US at 630-632, "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process[,]" and may interfere with a defendant's ability to communicate with his attorney, and undermines the "courtroom's formal dignity, which includes the respectful treatment of defendants[.]" Hulbert's choice to wear jail clothes does not render his shackling harmless.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

provide the jury with a closing argument.[3]  Counsel's ineffectiveness regarding voir dire is incontrovertible, and I turn first to that subject.

## A.  VOIR DIRE

During the voir dire of prospective jury members, a juror revealed that she had been a victim of domestic violence and expressed reservations about her ability to be fair:

> *Ms. McEnhill [the prosecutor]*: All right.  This case is a domestic violence case and sometimes that hits a little close to home for some people.  Is there anyone on the jury that either has been a victim of domestic violence in the past or accused of domestic violence in the past?

> (Whereupon, hand raised.)

> *Ms. McEnhill*:  All right.  Ms. [R]?

> *Prospective Juror [R]*:  Uh-huh.

> *Ms. McEnhill*: Okay.  And were you an alleged victim or an offender?

> *Prospective Juror [R]*:  Victim.

> *Ms. McEnhill* : Okay.  And how long ago was that?

> *Prospective Juror [R]*:  15 years.

> *Ms. McEnhill*:  Okay.

> *Prospective Juror [R]*:  It's been a while.

> *Ms. McEnhill*:  It's been a while.  You're going to hear evidence in this case, if you are asked to sit as a juror, and asked to assess it based on the evidence that's presented here in court.  Do you think that the fact that you were a victim previously, do you think that would affect your ability to be a juror?

> *Prospective Juror [R]*:  It might.

> *Ms. McEnhill*:  Okay.  And why do you think that?

> *Prospective Juror [R]*:  Flashbacks.  Hits a little too close to home.  I tend to kind of feel a little more sympathy, having gone through that.

---

[3] Hulbert preserved both issues by moving for a remand in this Court, which a motion panel denied without prejudice.

*Ms. McEnhill*:  If the Judge gave you the law that you were to follow, do you think you'd be able to follow the law?

*Prospective Juror [R]*:  I mean, if - - if there were absolute proof that he was innocent then I would be able to say that.

*Ms. McEnhill*:  Well, and we have to go back a little bit here, because the Judge - - as the Defendant sits there right now, the law says that he's innocent.  And so if the Judge told you that, and I haven't proven my case yet, would you be able to follow that law?

*Prospective Juror [R]*:  I would.  It may be a little hard, but I would.

*Ms. McEnhill*:  Okay.  And at the end of the case, you'd be asked to assess, just based on the evidence in court, whether or not I've proven my case beyond a reasonable doubt.  And if that's the law, do you think you could follow that?

*Prospective Juror [R]*:  Probably.

"Probably" was not reassuring of this juror's ability to be fair, particularly in light of her other answers.  Defense counsel did not ask a single question of Juror R.  He made no effort to substantively establish (or even explore) her feelings about domestic violence and its perpetrators, despite that she gave him good grounds to do so.  Although counsel intended to challenge Ms. R for cause based on the answers she had given, he executed his challenge in a grossly ineffective manner:

*The Court*:  Okay.  Thank you.  Jury's with the Defendant for any challenges for cause?

*Mr. Hendrickson*:  Your Honor, Juror Number 3, if I may, Juror [M].  I think she's got some things she told us about that would disqualify her, please.

*The Court*:  Okay.  Well, what specifically?

*Mr. Hendrickson*:  *Well, I remember her discussing some domestic violence, I think.  And, I mean, if I have to hash it all up, I suppose I could go back and try to remember exactly what she said*, but it just seemed to me that she wouldn't be probably very comfortable and I'd be concerned that she might hold it against my client.

*The Court*:  Okay.  Any input you want to add?

*Ms. McEnhill*:  Juror Number 3 has not spoken individually at all, I don't think, and did not reference domestic violence.

*Mr. Hendrickson*:  Who's that in the back?

*The Court*:  Okay.  Well, I don't know.  Ms. [M], have you got anything?

*Mr. Hendrickson*:  Oh, was that - -

*The Court*:  - - in your background that - -

*Mr. Hendrickson*:  - - [E], is that it?

*The Court*:  - - is going - - Just a minute.  Have you got anything in your background, Ms. [M], that's going to affect your ability to be fair and impartial?

*Prospective Juror [M]*:  No.

*The Court*:  Anything particularly problematic for you about domestic violence?

*Prospective Juror [M]*:  No.

*The Court*:  Okay.  Well, the motion to excuse her for cause is denied.

*Mr. Hendrickson*:  Your Honor, I think I misidentified - -

*The Court*:  Oh.

*Mr. Hendrickson*:  - - Juror [F], Number 5.

*The Court*:  Okay. Number 5?

*Mr. Hendrickson*:  *Have I got it closer to right this time*?

*The Court*:  I don't know.  What is your objection with regard to Ms. [F]?

*Mr. Hendrickson*:  I think it's the same objection.  I think I just picked the wrong - -

*The Court*:  Okay.

*Mr. Hendrickson*:  - - juror with the glasses in the back row.

*The Court*:  Any input you want to have?

*Ms. McEnhill*:  Ms. [F] has not indicated any history of domestic violence.

*The Court*:  Is there something about a domestic case that causes you to be biased against one side or the other?

*Ms. McEnhill*:  Ms. [F]'s on this end, Your Honor.  That's the juror that he cited.

*Mr. Hendrickson*:  I'm just - - I'm - -

*The Court*:  No.  He said Number 5 and he said Ms. [F].

*Ms*. *McEnhill*:  Oh, Ms. [F].  Sorry.

*The Court*:  Yeah.  Okay.  All right.  Just let me handle this.  Okay?  Ms. [F], do you have any - - any background related to domestic violence that is going to impact your ability to be fair and impartial here?

*Prospective Juror [F]*:  No.

*The Court*:  All right.  Your motion to challenge her for cause is denied. . . . [Emphasis added.]

This performance telegraphed to the jury two things: counsel was not paying attention, and the trial did not really matter.  Moreover, at that point in voir dire, the defense had one remaining peremptory challenge.  Even if counsel could not mount an effective challenge for cause, it was unreasonable and strikingly ineffective to have neglected to use the remaining peremptory challenge to remove Ms. R.

I cannot agree with my colleagues' characterization of counsel's voir dire as "thoughtful."  Counsel asked few questions, and the questions he asked were boilerplate.  Other than inquiring about foul language, counsel failed to tailor his voir dire to the facts of the case, never managed to obtain an answer (all his questions were met with "no audible response"), and utterly failed to follow up with questions of juror R.  Overall, this was a mediocre performance at best, and given counsel's inability to strike the proper juror, a thoroughly ineffective one.[4]

A defendant has an absolute right to a fair and impartial jury.  *People v Miller*, 411 Mich 321, 326; 307 NW2d 335 (1981).  Voir dire is intended to enable counsel to elicit enough information to make a rational choice regarding whether to exclude people from the jury who

---

[4] Nor can I agree with my colleagues regarding counsel's allegedly "careful[] explanation" of the term "reasonable doubt."  I cannot find an "explanation," but judge for yourself:

> *Mr*. *Hendrickson*:  Does anybody think that reasonable doubt means that you can't vote your conscience if you have a reason?  If you have a doubt?  Just because someone doesn't - - How do I want to say this?  There is sometime - - Well, there's often - -
>
> Well, they teach this.  The prosecutor has a heavy burden to carry so sometimes at some schools, some places, some courtrooms, well, some prosecutor's offices will teach the prosecutors who try and get the jurors to understand that the prosecutor doesn't need to prove quite so much.  They emphasize the word reason a lot when they talk about reasonable doubt.  If you have a doubt and you've got a reason for it, is that good enough for everybody here?  If you have a doubt about some evidence and if you have a reason for it, does that sound like reasonable doubt to everyone?

demonstrate partiality, or who may harbor beliefs potentially compromising their impartiality. Voir dire uncovers and illuminates bias as well as the *risk* of bias. Properly conducted, it is a powerful mechanism for safeguarding a defendant's Sixth Amendment right to a fair-minded jury.

Our Supreme Court has recommended that when ruling on challenges for cause, "a trial judge should, in cases where apprehension is reasonable, err on the side of the moving party. . . ." *Poet v Traverse City Osteopathic Hosp*, 433 Mich 228, 238; 445 NW2d 115 (1989). Such apprehension becomes reasonable "when a venire person, either in answer to a question posed on voir dire or upon his own initiative, affirmatively articulates a particularly biased opinion which may have a direct effect upon the person's ability to render an unaffected decision." *Id*. The Supreme Court cited favorably the following language from a Colorado Supreme Court case:

> "Where there is a sufficient reason to believe that at the beginning of the trial the prospective juror is not indifferent, but favors one of the litigants over the other *or may be unconsciously influenced by considerations in addition to the evidence presented at trial and the instructions of law, the juror must be dismissed for cause*." [*Id*. at 239, quoting *Blades v DaFoe*, 704 P 2d 317, 324 (Colo, 1985) (emphasis added).]

Ms. R was a problematic juror for the defense, as counsel fully recognized. Given her answers to questions focused on domestic violence ("Flashbacks. Hits a little too close to home. I tend to kind of feel a little more sympathy, having gone through that."), it made no sense to keep her on the jury. Challenging her for cause was a reasonable strategy. Forgetting who she was and guessing his way through the women on the venire demonstrated gross ineffectiveness, and likely insulted other jurors (no, all women do not look or sound alike).

To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that defense counsel's performance fell below an objective standard of professional reasonableness, and that, in the absence of counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different. *People v Grant*, 470 Mich 477, 485-486; 684 NW2d 686 (2004). Prejudice is demonstrated when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

The majority holds that Ms. R's weak and qualified "assurance" that she would follow the law eliminates any possible prejudice. I cannot agree with this proposition, as it basically immunizes attorneys who conduct a lackadaisical, semi-attentive, and otherwise ineffective voir dire. Our jurisprudence recognizes the critical nature of a well-conducted voir dire in ensuring a fair trial. Here, a juror's answers revealed that likely she would ally herself with the complainant. Counsel recognized this but fumbled abominably. He failed to question her to further expose her bias and failed to articulate a challenge for cause. After utterly bolloxing a for-cause challenge, counsel then failed to make the obviously necessary move—to excuse the juror peremptorily.

"The seating of a biased juror who should have been dismissed for cause requires reversal of the conviction." *Hughes v United States*, 258 F3d 453, 463 (CA 6, 2001). In such circumstances, *Strickland* prejudice "is presumed." *Id*. The presence of a juror who *likely* is biased

does not automatically require reversal of a defendant's conviction, but nevertheless, it may undermine confidence in the verdict. While it is true that 11 jurors in addition to Ms. R voted to convict, the views of a juror with personal experience of domestic violence likely played an important role in the jury's deliberations. This was a solidly "he said-she said" contest. Ms. R was the only juror with personal experience of domestic violence. Under these circumstances, I would hold that the risk of prejudice resulting from counsel's constitutionally ineffective voir dire is too high to be constitutionally tolerable.

## B. THE BODY CAM FOOTAGE

The majority declares that because the body came video had "little probative value," "presented defendant in a negative light for an extended period," and "injected considerations extraneous to the merits of the lawsuit by invoking the jury's anger or shock in response to defendant's behavior," counsel performed ineffectively by stipulating to its admission. I generally agree, although I suggest that the better course of action would have been to conduct a *Ginther* hearing to elucidate whether counsel did, in fact, have a legitimate basis for stipulating to its introduction. But assuming that the majority's ineffectiveness analysis is correct, I respectfully disagree with the majority's determination that the video was not prejudicial.

The majority rests its conclusion on an abbreviated review of controverted evidence. Yes, the complainant testified that Hulbert punched her in the face, but Hulbert vehemently denied that he had done so. Yes, an officer testified that it appeared that the complainant had an injury to her face; Hulbert claimed that she did not. The complainant testified that she had a broken nose, yet she never sought medical treatment, and no other evidence supported this allegation. Cross-examination revealed that the complainant had testified multiple times in multiple cases; the effort to paint her as a professional witness was one of counsel's few successes. I do not know who was lying about the events in this case, and neither does the majority. What is clear is that the video portrayed Hulbert as a deranged, profane, out-of-control, nasty human being deserving of neither respect nor credibility. In a case which turned on credibility assessments, the video was highly prejudicial. See *People v Armstrong*, 490 Mich 281, 291; 806 NW2d 676 (2011). I would reverse on this ground.

## C. CLOSING ARGUMENT

For unknown reasons, Hulbert's counsel declined to present any closing argument—not even to remind the jurors of the role of reasonable doubt. Once again, counsel telegraphed that the trial did not really matter. Perhaps this was a strategic decision. The only way to make this determination is through an evaluation of counsel's decision to remain silent based on his testimony during a *Ginther* hearing.

I respectfully disagree with the notion endorsed by the majority that a "decision to waive closing argument is a matter of trial strategy that we ordinarily will not question." In support of that proposition the majority cites *People v Burns*, 118 Mich App 242, 248; 324 NW2d 589 (1982), a case that is nonbinding under MCR 7.215(J)(1), because it was published before November 1, 1990. *Burns* actually states, "We can only assume that defense counsel's decision was a matter of trial strategy which we will not question." *Burns* is wrong and should not be cited again for this proposition.

-9-

*Strickland* counsels that an appellate court's first step when reviewing an ineffectiveness of counsel claim involving closing argument is to find out why counsel waived argument. If counsel was tired, fed up with the trial, inattentive, or unable to summon even one argument in favor of his client, likely he performed ineffectively. The Supreme Court of the United States has emphasized that the importance of a closing argument cannot be understated:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

> The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, *no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.* [*Herring v New York*, 422 US 853, 862; 95 S Ct 2550; 45 L Ed 2d 593 (1975) (citation omitted, emphasis added).]

Here, counsel's failure to make any argument contrasted with the prosecution's good one. Had there been a jury member who remained unconvinced of Hulbert's guilt, counsel offered no help. In a case that rose or fell on credibility, I am unable to discern any logic to this approach.

Because counsel's performance was likely ineffective on several levels, I would remand for a *Ginther* hearing. But even absent a *Ginther* hearing, reversal is warranted based on the highly prejudicial body cam video. Singularly or in combination, this error undermines confidence in the verdict.

/s/ Elizabeth L. Gleicher